Deborah J. NEWMAN and Terry
Newman, Appellants–
Respondents,

v.

FORD MOTOR COMPANY, Respondent–
Appellant, CBS Redi–Mix and William
McCoy, Respondents.

No. 80523.

Supreme Court of Missouri,
En Banc.

Sept. 8, 1998.

Thomas Strong, Clifton M. Smart III, James A. Burt, Springfield, for Appellants–Respondents.

Theodore J. Boutrous, Jr., Mark A. Perry, Washington, D.C., Gary R. Cunningham, Craig A. Smith, Springfield, for Respondent–Appellant.

Thomas O. Baker, James R. Jarrow, Kansas City, Hugh F. Young, Jr., Reston, VA, Aaron D. Twerski, Brooklyn, NY, James A. Henderson, Jr., Ithaca, NY, for Amicus Curiae.

WHITE, Judge.

Deborah Newman was paralyzed after the Ford Aerostar she was driving was rear-ended by a dump truck. Ms. Newman and her husband sued the owner of the truck (CBS) and its driver (William McCoy) for negligence and Ford for defective design of the seat in which Ms. Newman was sitting. After trial, a jury assessed the Newmans' damages at $12.5 million and apportioned fault as follows: seventy percent to CBS and McCoy, twenty-five percent to Ford, and five percent to Ms. Newman. The judgment is affirmed as modified.

## Facts

On May 26, 1993, Deborah Newman was driving her 1988 Ford Aerostar on Highway 125, in Greene County, Missouri. As she was stopped behind another car waiting for it to make a left turn, Mr. McCoy's truck, loaded with gravel, approached down a hill from behind, moving at approximately forty-five miles per hour. After realizing that the cars in front of him were stopped, Mr. McCoy attempted to stop his truck, but was unsuccessful and impacted the rear of Ms. Newman's car at approximately thirty miles per hour. Ms. Newman's car was thrown forward and collided with the rear of the car ahead of her. While Mr. McCoy, the other two passengers in Ms. Newman's car, and the five occupants of the first car suffered relatively minor injuries, Ms. Newman's seat collapsed under the force of the impact, and she was thrown backwards; her shoulders struck the back seat, fracturing her spine and causing her to become paraplegic.

## Disclosure of Agreement Between Plaintiffs and the CBS Defendants

Prior to trial, the Newmans and the CBS defendants (CBS and McCoy) entered into an agreement. They agreed that, in the event of a verdict against the CBS defendants, the Newmans would satisfy their judgment solely from CBS's liability insurance policy,[1] which limited their recovery to the approximately $ 468,000 remaining under the policy limits. In return, the CBS defendants agreed not to appeal any adverse judgment and to employ a specified law firm—not associated with CBS's insurer—to defend it from that point forward. Ford argues that the failure of the trial court to grant its requests to inform the jury of this agreement was reversible error.

■ The general rule is that evidence of settlement agreements is not admissible, absent a clear and cogent reason, because they tend to be highly prejudicial.[2] An exception is made to this general rule for so-called "Mary Carter" agreements,[3] which this Court has described as follows:

Mary Carter agreements occur in multi-party litigation when fewer than all defendants settle with the plaintiffs. The term encompasses a wide variety of settlement arrangements that are limited only by the ingenuity of counsel and the willingness of the parties to sign. A typical Mary Carter agreement has the following features:

1) The liability of the settling defendant is limited, and the plaintiff is guaranteed a minimum recovery;

2) The settling defendant remains a party to the pending action without disclosing the full agreement to the non-settling parties and/or the judge and jury, absent court order; and

3) If judgment against the non-settling defendant is for more than the amount of settlement, any money collected will first offset the settlement so that the settling defendant may ultimately pay nothing.[4]

Ford argues that the agreement here is a Mary Carter agreement and, as such, should have been disclosed to the jury unless the court found that disclosure would have created a substantial risk of undue prejudice or

1. *See* section 537.065, RSMo 1994.

2. *O'Neal v. Pipes Enterprises, Inc.,* 930 S.W.2d 416, 423 (Mo.App.1995); *Asbridge v. General Motors,* 797 S.W.2d 775, 781 (Mo.App.1990).

3. After *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.Dist.Ct.App.1967) (per curiam).

4. *Carter v. Tom's Truck Repair, Inc.,* 857 S.W.2d 172, 175 (Mo. banc 1993) (internal citations omitted).

confusion.[5] The trial court neither made such a finding nor allowed disclosure. Rather, the trial court concluded that, since the agreement in question was less prone to deceive the jury than the typical Mary Carter agreement, measures short of disclosure would suffice to assure fairness.

Ford maintains that a Mary Carter agreement exists whenever a settling party remains at trial, and that such an arrangement must always be disclosed to the jury. Although the presence of a settling party at trial is a necessary condition for a Mary Carter agreement to exist,[6] it is not sufficient. A number of the typical indicia of a Mary Carter agreement, as described in *Carter*, were not present here. Although the agreement was not disclosed to the jury, it was not kept secret from the trial court or the non-settling defendant. The Newmans were not guaranteed a minimum recovery under the agreement, nor was any judgment against the CBS defendants to be reduced or offset by any amounts recovered from Ford. To be sure, *Carter's* mandatory disclosure rule is not limited to agreements that precisely match its definition of a Mary Carter agreement. In particular, an agreement that contains the "distinctive features [that] distort the adversarial process and potentially undermine the right to a fair trial," such as one that gives "the settling defendant[ ] direct financial interest in the amount recovered against any non-settling defendant," must be disclosed absent a specific finding that disclosure would be unduly prejudicial.[7] While the agreement here did not contain the prototypical features of a Mary Carter agreement, which generally mandate disclosure, we agree with Ford that any agreement whereby a party remains at trial with an interest that remains hidden from the jury raises questions of fairness.

The key danger of this sort of agreement is that the settling defendant will fail to operate as an adversary and, instead, seek to bolster the plaintiff's case against what a factfinder, absent knowledge of the agreement, would assume was its own interest. This is most dramatically a danger in the traditional Mary Carter agreement, where the settling defendant has an incentive to inflate the damages of the plaintiff, since its exposure is reduced proportionally to the full amount of damages awarded, exactly the opposite of what an uninformed tribunal would expect. This distortion may also be present, in a more subtle form, where the defendant has completely settled the case and, thus, remains involved in litigation only because required to do so by the agreement.[8] The distortion of the adversarial process is less pronounced here, since the interests of the parties remained much the same after the agreement. The CBS defendants, before the agreement, had an incentive to try to minimize their own culpability and to magnify that of Ford and of the plaintiff herself. The agreement did little to change that. The CBS defendants' interest remained to minimize the award against them, by blaming Ford or the plaintiff. Contrary to a typical Mary Carter agreement, the CBS defendants retained an interest in making sure that the total amount of damages was as small as possible. Additionally, the CBS defendants did not remain a party to the case solely because the agreement required them to; instead, they actively participated in the litigation because it was in their direct financial interest to do so.

It is also difficult to see how this agreement could have been disclosed to the jury without creating severe prejudice to the CBS defendants. As *Carter* notes, even when a Mary Carter agreement is present, disclosure of its terms must be carefully limited to avoid impermissible prejudice.[9] Specifically, matters like amounts of settlement and references to insurance ought to be redacted from disclosures to the jury.[10] Here, the essence of the agreement was to limit recovery to a specified amount, to be paid from an insur-

---

5. *See id.* at 178.

6. *O'Neal,* 930 S.W.2d at 423.

7. *Carter,* 857 S.W.2d at 175–76.

8. *See Dosdourian v. Carsten,* 624 So.2d 241, 247 (Fla.1993).

9. 857 S.W.2d at 178.

10. *Id.*

ance policy. No payment was received by the Newmans, and the CBS defendants were not released from liability. Very little in the agreement could have been permissibly disclosed to jurors.

■ The fairness interest served by disclosure of the true alignment of the parties to the jury must be weighed against the countervailing interests in encouraging settlements and avoiding prejudice to settling parties. Since agreements to settle claims between parties who nevertheless remain at trial are virtually limitless in their possible permutations, this balance will necessarily be struck differently depending on the facts of each case. Thus, we must rely on the sound discretion of the trial court to ensure that, whatever the circumstances of a particular case, the integrity of the adversary process is preserved. The measures actually taken by the court here are instructive of what may be done, short of disclosure, to ensure true adversariality of the parties. Throughout the trial, the court deferred ruling on Ford's motion to disclose the agreement in order to ensure that CBS would provide an appropriate and vigorous defense. The trial court allotted two of the defense's three peremptory strikes to Ford and also altered the order of closing argument so that Ford would argue after CBS, reducing the opportunity for the CBS defendants to undermine Ford's defense without allowing Ford to respond. We reiterate that the best cure for the problems created by Mary Carter agreements is disclosure to the jury.[11] But even less collusive agreements—like the one at issue here—raise questions of fairness. The trial court has both the duty and the discretion to fashion procedures that ensure fairness to all litigants in these situations. Here, the trial court took commendable efforts to ensure that the pre-trial agreement did not disrupt the adversarial nature of the trial. Accordingly, it did not abuse its discretion in refusing to disclose the agreement to the jury.

### Evidence of Other Incidents

Ford next premises error on the failure of the trial court to sustain its objection to evidence of other rear-end collisions. In their case-in-chief the Newmans presented evidence of five other rear-end collisions where passengers in Ford cars were ejected from their collapsed seats, despite the fact that they were reportedly wearing seatbelts. This matter was placed in issue by Ford, which contended throughout trial that Ms. Newman's seat had functioned as it was designed and that her ejection and subsequent injuries were due in large part to the (controverted) fact that she had not been wearing her seat belt. The trial court allowed this evidence to be presented, subject to a limiting instruction that the jury only consider the evidence for the purpose of deciding the effect that a seat belt had in restraining the occupants of a rear-impact crash and not for the purpose of deciding whether the seat at issue was defective. Ford claims that the plaintiffs did not show, and the trial court did not find, that these incidents were substantially similar to Ms. Newman's accident.

■ Ford has a very difficult burden to meet:

> Trial courts have wide discretion on issues of admission of evidence of similar occurrences. *Pierce v. Platte–Clay Electric Co–op., Inc.,* 769 S.W.2d 769, 774 (Mo. banc 1989). This Court's review is limited to whether the trial court determined that the evidence was relevant and that the occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice and confusion of issues. *Id.* Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.[12]

---

11. *Id.*

12. *Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876, 881 (Mo. banc 1993).

Prior to the initial presentation of this evidence to the jury, the court required plaintiffs' expert to be examined outside the jury's presence, specifically on the question of whether these accidents were substantially similar, as they related to seat belt effectiveness, to Ms. Newman's accident. The expert was examined on what factors were, in his opinion, important in determining whether the other occurrences were similar to Ms. Newman's as to the motion of the restrained passenger and was asked in some detail about the circumstances of these accidents. The record makes clear that the court required the proponent of the evidence to present evidence of substantial similarity, and specifically overruled defendant's objections on these grounds. Contrary to Ford's assertion, nothing in the record indicates that the trial court did not "satisf[y] itself that the evidence was relevant to an issue of the case and that the occurrences bore sufficient resemblance to the injury-causing incident...." [13] Accordingly, the trial court did not abuse its discretion in allowing evidence of other rear-end crashes where the seat occupants were ejected despite wearing seat belts.

■ Ford also objected, on lack of substantial similarity grounds, to rebuttal evidence presented by the Newmans and the CBS defendants. The Newmans' rebuttal expert described three case studies he had investigated for a paper on the dangers of collapsing seats. CBS's expert described fourteen incidents he had investigated involving rear-end collisions where the occupants had been injured. Ford argues that proponents had not shown that these incidents were substantially similar to Ms. Newman's and that the trial court abused its discretion in admitting evidence of them.

Contrary to Ford's assertion, evidence of substantial similarity was present; indeed, it was the heart of Ford's own case. Ford's theory of the case was that all "production" seats, like the one found in the Aerostar and

in large numbers of other Ford and non-Ford cars, were designed to collapse backwards in the event of a rear impact collision, and that such a design choice was reasonable since it led to fewer serious injuries. To further this argument Ford presented statistical evidence of collisions involving "production" seats, strength tests on seats made by ninety-four other carmakers, and crash films of a number of other cars made by other manufacturers. The point of this evidence was to show that Ford's seat was just as safe as those of other manufacturers. The trial court did not abuse its discretion by allowing the other parties in the litigation to turn the argument around in rebuttal by attempting to show that other production seats were just as dangerous as they claimed Ford's were.

## The "Risk–Utility" Instruction

■ This case was submitted to the jury on both negligence and strict product liability theories. To recover on a strict liability theory in a defective design case, a plaintiff must demonstrate "that the product, as designed, is unreasonably dangerous and therefore 'defective'...." [14] As this Court has previously discussed, the question of what constitutes an unreasonable danger in the product design arena is the subject of vigorous debate. [15] This debate has recently reached new levels of intensity with the adoption of the Restatement (Third) of Torts: Product Liability, section 2(b), which abandons the Second Restatement's "consumer expectations" test in favor of a "risk-utility" test. Under the Third Restatement's test, a product is defectively designed "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller ..., and the omission of the alternative design renders the product not reasonably safe...." [16] As the *amicus* Product Liability Advisory Council, Inc., notes, under this test a plaintiff must prove that: "(1) a reasonable, safer, alternative design was available at the time of sale; and (2) omission of the safer

---

13. *Pierce v. Platte–Clay Elec. Coop., Inc.,* 769 S.W.2d 769, 774 (Mo. banc 1989).

14. *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371, 375 (Mo. banc 1986).

15. *Id.* at 376–78.

16. Restatement (Third) of Torts: Products Liability, section 2(b).

alternative rendered the product 'not reasonably safe.'" Both *amicus* and Ford argue with great force that this test is superior to the consumer expectations test and should be immediately embraced by this Court as the test for determining whether a product is defectively designed. While this question is surely one of great academic and practical interest, it is one this Court has repeatedly resisted answering before the issue is squarely presented.[17]

■ The only question presented in this appeal is whether a specific, non-MAI instruction requested by Ford was appropriately denied. As required by MAI 25.04, the trial court gave the jury an instruction requiring them to find in favor of plaintiffs on the strict liability theory if, *inter alia*, the product was, at the time of sale, "in a defective condition unreasonably dangerous when put to a reasonably anticipated use...." In addition, Ford submitted its proposed instruction H, which read, in its entirety: "The phrase 'unreasonably dangerous' as used in these instructions means that the utility or usefulness of the product was outweighed by its risks."

■ "A party who believes that additional instructions are legally appropriate must request a correct instruction and must develop an evidentiary record in support."[18] While the factual record here demonstrates that the relative costs and benefits of alternative seat designs was a primary issue in the case, we are not persuaded that the instruction proffered is superior to the approved instruction in guiding the jury's consideration of these issues. The new Restatement itself, while endorsing Ford's proposed test as the proper one for determining whether to submit a defective design issue to the jury, is entirely agnostic as to the question of the proper form of jury instructions.

[J]ury instructions often are couched in language that asks the jury to determine whether the product is not reasonably safe, is unreasonably dangerous, or fails to meet reasonable consumer expectations. The requirement that proof of a reasonable alternative design be introduced as a necessary predicate for reaching the jury in a design defect case is a rule of law for the court. Once a court finds that sufficient evidence of a reasonable alternative design has been introduced, this Restatement leaves the formulation of the jury instruction to the local law applicable in trial courts in the various states. Many states require proof of a reasonable alternative design as a prerequisite to reaching the jury, yet couch their jury instructions in more general language that often includes consumer expectations. The practice of these jurisdictions is fully compatible with the rule stated in this Section.[19]

While Ford directs much of its argument towards demonstrating that a large majority of states have adopted a risk-utility test for submissibility, it does not show that this particular instruction, or a substantively similar one, has been adopted by any other state. Indeed, it is difficult to see how this instruction would serve the goal of the Restatement, since it fails to mention the one concept that Ford and the *amicus* see as key in design defect cases of this sort—a reasonable alternative design. While the terms "risk" and "utility" might be adequate shorthand for this concept to those well-versed in the Restatement of Torts, the instruction does not guide the typical juror towards weighing competing alternative designs any more than the approved instruction does. In this regard, the proffered instruction stands in contrast to instructions cited by Ford as adopting the risk-utility test, such as the instruction, adopted by the Minnesota Supreme Court, which asks the jury to engage in "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the

---

17. *Nesselrode*, 707 S.W.2d at 377–78; *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 674 (Mo. banc 1991).

18. *Hagen*, 816 S.W.2d at 674.

19. Restatement (Third) of Torts: Product Liability section 2, Rpt. Note, comment d. *See also id.*, Comment f ("This Restatement takes no position regarding the specifics of how a jury should be instructed. So long as jury instructions are generally consistent with the rule of law set forth in Subsection (b), their specific form and content are matters of local law."); *id.*, Illustration 6 ("Whether instructions to the trier of fact should include specific reference to these factors is beyond the scope of this Restatement and should be determined under local law.").

burden of the precaution which would be effective to avoid the harm."[20]

While Ford argues that the MAI instruction fails to provide sufficient guidance to jurors in determining what is unreasonably dangerous, this Court has, while recognizing that it is a minority approach, explained the benefits of an instruction that treats "unreasonable danger" as an ultimate issue and avoids "abstract, abstruse" external standards.[21] A signal virtue of such a general instruction is that it allows the jury to give the concept of unreasonable danger content "by applying their collective intelligence and experience to the broad evidentiary spectrum of facts and circumstances presented by the parties."[22] Nothing prevents the litigants from arguing that the utility of a design outweighs its risks, or that consumer expectations were violated, or any other theory of unreasonable dangerousness supported by the evidence. The Third Restatement itself argues that this manner of instruction is entirely consistent with a risk-utility test for submissibility of design defect claims.

Even assuming that this Court were inclined to depart from *Nesselrode* and adopt a more specific definition of "unreasonably dangerous" in jury instructions, the instruction at issue here does not achieve that goal. The *amicus* brief makes the point exactly: "If … Missouri law requires plaintiffs to show how the defendant's design could have been safer, then it makes good sense to instruct the jury, at the close of trial, that a design is 'in a defective condition unreasonably dangerous' if a reasonable, feasible, safer, alternative design would have reduced or prevented the plaintiff's injuries, and if the omission from the product of that alternative rendered the product not reasonably safe." Perhaps the *amicus* is correct. But that question is not before the Court, since no instruction of that sort was offered to the trial court.

Even if Ford is correct that the risk-utility test is proper in defective design cases of this sort, Ford's proffered instruction was correctly rejected by the trial court, since the instruction failed to adequately put the issue of reasonable alternative design to the jury.

## Comparative Fault Instruction

As noted above, a major aspect of Ford's trial strategy was to argue that Ms. Newman's failure to wear a seatbelt contributed to the cause and severity of her injuries. Consistent with this theory, Ford proposed, and the court submitted to the jury, a comparative fault instruction. Pursuant to that instruction, the jury assessed five percent fault against Ms. Newman. In her sole point on appeal, Ms. Newman challenges the propriety of a comparative fault instruction premised on the failure to wear a seatbelt.

Section 307.178 requires the use of a seatbelt for most front seat occupants of passenger cars. Subsection 3 sharply limits the degree to which evidence of a failure to obey this law may be used against an injured motorist:

> In any action to recover damages arising out of the ownership, common maintenance or operation of a motor vehicle, failure to wear a safety belt in violation of this section shall not be considered evidence of comparative negligence.

At most, a defendant can use this evidence, under some circumstances, to mitigate damages, but by no more than one percent of the amount awarded.[23] Ford argues that the statute does not apply, because the damages did not arise out of its ownership, maintenance or operation of the vehicle, but rather out of its design or manufacture of the car. Our precepts for interpreting statutory language are well-settled:

> As has been noted repeatedly, this Court has a duty to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in their plain and ordinary meaning. *Wolff Shoe Co. v. Di-*

---

**20.** *Bilotta v. Kelley Co.,* 346 N.W.2d 616, 621 (Minn.1984).

**21.** *Nesselrode,* 707 S.W.2d at 378 (citing Leon Green, *Strict Liability Under Sections 402A and 402B: A Decade of Litigation,* 54 Tex. L.Rev. 1185, 1206 (1976)).

**22.** *Id.*

**23.** Section 307.178.3(2), RSMo 1994.

*rector of Revenue,* 762 S.W.2d 29, 31 (Mo. banc 1988). This Court cannot look to rules of construction if the statute contains no ambiguity. *Bosworth v. Sewell,* 918 S.W.2d 773, 777 (Mo. banc 1996). "When statutory language is clear, courts must give effect to the language as written." *M.A.B. v. Nicely,* 909 S.W.2d 669, 672 (Mo. banc 1995).[24]

*LaHue v. General Motors Corp.,* a federal district court case interpreting the Missouri statute, applied these principles and reached the conclusion advocated by Ford.[25] *LaHue* reasoned as follows:

> The legislature clearly specified the sorts of cases in which evidence of failure to use seat belts was inadmissible. In Section 307.178.3 the legislature ·established that the evidence of failure to use seat belts could not be used ... "[i]n any action to recover damages arising out of *the ownership, common maintenance or operation* of a motor vehicle."
>
> Conspicuously absent is any reference to the *design* or *construction* of a motor vehicle. Even the most liberal interpretation of the words "ownership," "common maintenance" and "operation" cannot stretch far enough to include design and construction. The plain meaning of the statute compels a conclusion that it was not intended to prevent evidence of failure to use seat belts in a product liability case.[26]

While Ford is certainly correct that "operation" is not design, this argument ultimately fails, since it assumes its conclusion—that the "operation" referred to is that of the defendant and not of the plaintiff. The section refers only to damages arising out of the operation of a motor vehicle; it does not specify by whom, nor must it in order to make sense. Under the most plain reading of the statute, contributory negligence on the part of a plaintiff for not wearing a seatbelt is disallowed in any action for damages arising out of operation of a motor vehicle, whether or not the defendant was the one operating the vehicle.

While the trial court erred in giving the contributory negligence instruction, this er-ror can be corrected without a new trial, by allocating the remaining five percent fault proportionally between the remaining defendants. Thus, the judgment is modified to assess 26.32 percent fault to Ford, and 73.68 percent to the CBS defendants. Damages to Ms. Newman are raised to $ 12,000,000, and with prejudgment interest the amount of the judgment in her favor is amended to be $ 13,982,465.70. Mr. Newman's award is increased to $ 500,000, and the total amount of judgment in his favor, including prejudgment interest, is amended to $ 582,602.69.

The judgment of the trial court is affirmed as modified.

BENTON, C.J., PRICE, LIMBAUGH, and COVINGTON, JJ., and HAMILTON, Special Judge. concur.

HOLSTEIN, J., not sitting.

WOLFF, J., not participating because not a member of the Court when the cause was submitted.

---

**24.** *State ex rel. Baumruk v. Belt,* 964 S.W.2d 443, 446 (Mo. banc 1998).

**25.** 716 F.Supp. 407, 412 (W.D.Mo.1989).

**26.** *Id.* (emphasis in original).