Anthony Rex Gabbert, Judge
Philip Stratman appeals the circuit court's December 13, 2016, judgment entered after a jury verdict finding Stratman 99% at fault for injuries Steven Holdeman sustained in a motor vehicle collision and awarding Mr. Holdeman and Mr. Holdeman's wife, Sarah Holdeman,[1] past and future damages related to Mr. Holdeman's injuries and Mrs. Holdeman's loss of consortium. Stratman contends on appeal that *49 the circuit court erred in: 1) prohibiting Stratman from impeaching the credibility of the Holdemans' liability expert through the use of materials contained in his file evidencing a settlement reached between the Holdemans and two of the three defendants, 2) excluding evidence of settlement agreements to impeach witnesses and demonstrate party bias, 3) limiting use of defendant Brown's failed post-accident drug test, 4) excluding the testimony of Stratman's non-retained expert on the basis of work product privilege, and 5) permitting new, undisclosed expert opinions on the Holdemans' claim of future loss of income. We affirm.
Factual and Procedural Background
On February 13, 2014, around 11:00 p.m., Philip Stratman was driving his wife's Mitsubishi Galant south on Interstate 435 approaching the Winner Road exit on his way home from a casino. This portion of I-435 has three lanes with shoulders on the inside and outside lanes. The maximum speed on the highway is sixty-five miles per hour and the minimum speed is forty miles per hour. Stratman, with knowledge that the vehicle he was driving had a tendency to die when the engine was at low RPM's, shifted his car into neutral to save gas and reduce wear and tear on his brakes. He coasted in the center lane, rather than moving to the right lane or exit lane; he had just washed the car and wanted to avoid getting it dirty. He intended to remain in the center lane until reducing his speed to twenty-five miles per hour and then planned to move to the exit ramp. After coasting for approximately 1600 feet, Stratman's car died, and he came to a complete stop in the center lane of the highway. He did not activate his hazard lights.
Behind Stratman, Mr. Holdeman was driving his wife's Volkswagen Rabbit. He was driving his normal route to work. As he started the decline toward the Winner Road exit, he saw Stratman's car in the center lane. Mr. Holdeman had noticed Stratman's car slowing down and was able to come to a complete stop behind Stratman's stalled car. However, behind Mr. Holdeman was Roger Brown, a commercial truck driver hauling a load for C&G Express. Brown saw Stratman's and Mr. Holdeman's cars in front of him as he began the 1600 foot decline toward the Winner Road exit. He saw their taillights and thought it was normal traffic. About 300 feet away, he realized they were stopped. Brown braked but was unable to stop and collided with Mr. Holdeman's car while traveling at about fifty-two miles per hour. Physical evidence showed heavy emergency braking by Brown starting seventy-two feet before the impact.
Mr. Holdeman was hit from behind by Brown. On impact, the front of Mr. Holdeman's car was pushed into the back of Stratman's car. Mr. Holdeman was severely injured in the crash. He suffered injuries to his spine rendering him a paraplegic.
On April 2, 2015, the Holdemans filed suit against Stratman, Brown, and Brown's employer, C&G Express. The Holdemans claimed past and future damages related to Mr. Holdeman's injuries and Mrs. Holdeman's loss of consortium. After a two-week jury trial, the jury found Mr. Holdeman 1% at fault for his injuries, Stratman 99% at fault for Mr. Holdeman's injuries, and Brown (and C&G Express, where vicarious liability was claimed) 0% at fault for Mr. Holdeman's injuries. The jury awarded Mr. Holdeman $30,000,000 for his personal injuries and Mrs. Holdeman $7,500,000 for her loss of consortium. Stratman appeals the judgment entered upon that jury verdict.
*50 Standard of Review
Stratman's five points on appeal all involve alleged error regarding the trial court's admission or exclusion of evidence. " 'We review the trial court's admission or exclusion of evidence under a deferential standard of review.' " McGuire v. Kenoma , LLC, 375 S.W.3d 157, 183-184 (Mo. App. 2012) (quoting Ziolkowski v. Heartland Regional Medical Center , 317 S.W.3d 212, 216 (Mo. App. 2010) ). On appellate review, the issue is not whether the evidence was admissible or should have been excluded, it is whether the trial court abused its discretion in admitting or excluding the evidence. McGuire , 375 S.W.3d at 184. "A circuit court has broad discretion in determining the admission of evidence [.]" Lewellen v. Franklin , 441 S.W.3d 136, 149 (Mo. banc 2014). A court abuses its discretion only when the court's ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." State v. Johnson , 207 S.W.3d 24, 40 (Mo. banc 2006). "If reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion." State v. Quick , 334 S.W.3d 603, 609 (Mo. App. 2011) (citing State v. Reed , 282 S.W.3d 835, 837 (Mo. banc 2009) ). Even if we find an abuse of discretion, we "will reverse only if the prejudice resulting from the improper admission of evidence is outcome-determinative." Williams v. Trans States Airlines, Inc. , 281 S.W.3d 854, 872 (Mo. App. 2009).
Point I-Exclusion of Settlement Evidence to Impeach Expert
In his first point on appeal, Stratman contends the circuit court erred in excluding evidence that the Holdemans settled with Brown and C&G Express prior to filing suit, arguing that the evidence was relevant and admissible to impeach the credibility of the Holdemans' accident reconstruction expert. Stratman claims the expert, Fred Semke, had information in his file regarding executed settlement agreements, which Semke admitted he reviewed.[2] Stratman contends he was entitled to impeach the credibility of Semke's opinions with this settlement evidence because Semke found no fault with Brown's conduct in causing the collision. Stratman argues that because Semke acknowledged that at the time of the accident Brown was over the allowed number of driving time hours, inaccurately kept logs of the number of hours driven, and saw the cars in front of him but braked only one hundred yards before impact, Semke should have concluded that Brown had some responsibility for the collision. Stratman contends that, even if Semke did not believe the settlement between Brown, C&G Express, and the Holdemans affected his opinion as to fault, the jury was entitled to decide whether it influenced his opinion. Stratman argues prejudice is proven by the jury's allocation of 0% fault to Brown and 99% to Stratman.
"The basic rule, in Missouri and elsewhere, is that evidence of settlement agreements is not admissible. This is because settlement agreements tend to be highly prejudicial and, thus, should be kept from the jury unless a clear and cogent reason exists for admitting a particular settlement agreement." Mengwasser v. Anthony Kempker Trucking, Inc. , 312 S.W.3d 368, 376 (Mo. App. 2010) (internal *51 citation and quotation marks omitted); Newman v. Ford Motor Co. , 975 S.W.2d 147, 149 (Mo. banc 1998).
We first note that, although Stratman requested the court allow him to question Semke regarding the settlement agreements, Stratman never made an offer of proof regarding the questions he intended to ask Semke or Semke's proposed testimony. An offer of proof is required to preserve a claim that the court improperly excluded evidence. Lozano v. BNSF Ry. Co. , 421 S.W.3d 448, 452 n.4 (Mo. banc 2014).[3] Nevertheless, it appears all parties agreed at trial that Stratman preserved this issue for appeal. Just prior to Semke's testimony, the Holdemans' counsel stated to the court:
Counsel [ ] are in agreement to permit Defendant Stratman to have a continuing objection to the Court's ruling excluding 537.065[4] so that we don't have to bring that up each time. We stipulate to it. They have, in our view-on the record, we are stating that they have preserved that on appeal, and that it is not necessary, pursuant to our stipulation, to raise it each and every time that they wish to. It's preserved no matter what the conclusion of the case so that we can avoid-for efficiency.
Nevertheless, Stratman's arguments on appeal exemplify the value and necessity of an offer of proof. While Stratman argues that knowledge of the settlement agreements biased Semke, he fails to show how. Logically, the settlement agreements suggest that Brown and C&G Express admitted some fault for the accident, or at the very least chose to accept some responsibility in lieu of risking a more unfavorable jury verdict. This logical assumption is one reason settlement agreements are considered highly prejudicial and are not disclosed to juries. See State ex rel. Malan v. Huesemann , 942 S.W.2d 424, 428 (Mo. App. 1997) (internal quotation marks and citation omitted) (discussing that the danger of admitting settlement evidence is that the trier of fact may consider the settlement an indication of the merits of the case, thereby denigrating the defense position at trial.) Semke, however, found Brown and C&G Express to have no fault for the accident. Therefore, there is no logical connection between Semke's knowledge of the settlement agreements and his ultimate conclusions. Stratman's attacks on Semke's opinions really go toward suggesting bias as the Holdemans' hired expert or conclusions not supported by the evidence. These were issues Stratman had the opportunity to attack through other means.[5]
Relevancy is the key criterion for admission of evidence, and the court must find evidence both logically and legally relevant in order to admit it. Evidence is logically relevant if such evidence tends to make the existence of any material *52 fact more or less probable than it would be without the evidence. But the inquiry does not end with logical relevance. Evidence must also be legally relevant to be admitted. To determine legal relevance, the court must weigh the probative value, or usefulness, of the evidence against its costs, specifically the dangers of unfair prejudice, confusion of the issues, undue delay, misleading the jury, waste of time, or needless presentation of cumulative evidence. The trial court must measure the usefulness of the evidence against its cost, and if the cost outweighs the usefulness, then the evidence is not legally relevant, and the court should exclude it.
Kroeger-Eberhart v. Eberhart , 254 S.W.3d 38, 43 (Mo. App. 2007) (internal quotation marks and citations omitted).
Stratman fails to explain how Semke's knowledge of the settlement agreements impacted his testimony in this case, and how putting that information in front of a jury would have truly served to impeach Semke's fault conclusions. Because there is no logical connection to the settlement agreements and Semke's fault conclusions and no offer of proof was made establishing a connection, Stratman's assertion that Semke's knowledge of the settlement agreements influenced his testimony is speculative and unfounded. Stratman fails to prove the logical or legal relevance of the settlement agreements to Semke's testimony.
We find no clear and cogent reason for admitting evidence of the settlement agreements for impeachment of Semke's conclusions regarding fault where its relevancy for impeachment was tenuous but its potential for prejudice was not. The circuit court did not abuse its discretion in following the general rule of exclusion with regard to settlement agreements and in excluding evidence that the Holdemans settled with Brown and C&G Express prior to filing suit.
Point one is denied.
Point II-General Exclusion of Settlement Evidence
In his second point on appeal, Stratman argues that the circuit court erred in generally excluding evidence that the Holdemans settled with Brown and C&G Express prior to filing suit, arguing that the evidence was relevant and admissible to impeach credibility, show party and witness bias, and to explain to the jury why the parties and witnesses may have centered fault on Stratman and not Brown. He contends that because Brown and C&G Express had settled with the Holdemans, they were not true adversaries, and the jury was led to believe there was an adversarial relationship between the Holdemans, Brown, and C&G Express because those parties remained in the case. Stratman contends this distorted the adversarial process and denied him a fair trial. He believes evidence of the Holdemans' settlement agreements with Brown and C&G Express were essential for a fair trial, similar to the requirement that "Mary Carter agreements" be disclosed to ensure a fair trial. Stratman argues that the "dangers recognized by nondisclosure of Mary Carter agreements, [are] analogous to the dangers that occurred in this case."
Our Missouri Supreme Court describes "Mary Carter" agreements in Newman v. Ford Motor Co. , 975 S.W.2d 147, 149 (Mo. banc 1998) :[6]
Mary Carter agreements occur in multiparty litigation when fewer than all defendants settle with the plaintiffs. The term encompasses a wide variety of settlement *53 arrangements that are limited only by the ingenuity of counsel and the willingness of the parties to sign. A typical Mary Carter agreement has the following features:
1) The liability of the settling defendant is limited, and the plaintiff is guaranteed a minimum recovery;
2) The settling defendant remains a party to the pending action without disclosing the full agreement to the non-settling parties and/or the judge and jury, absent court order; and
3) If judgment against the non-settling defendant is for more than the amount of settlement, any money collected will first offset the settlement so that the settling defendant may ultimately pay nothing.
Stratman acknowledges the settlement agreements here were not "Mary Carter" agreements. Here, the non-settling parties were aware of the agreements, and there was no provision that Brown and C&G Express would financially gain if the Holdemans recovered from Stratman at trial. Stratman suggests, however, as Ford Motor Company did in Newman , that a Mary Carter agreement exists whenever a settling party remains at trial and that such an arrangement must always be disclosed to the jury. See Id. at 150. The Supreme Court rejected this notion in Newman and made clear, "[a]lthough the presence of a settling party at trial is a necessary condition for a Mary Carter agreement to exist, it is not sufficient." Id. The Newman Court did find, however, that mandatory disclosure is not limited to agreements precisely matching a Mary Carter agreement and if an agreement has "distinctive features that distort the adversarial process and potentially undermine the right to a fair trial"-such as where the settling defendant has a direct financial interest in recovery against a non-settling defendant-then disclosure is necessary unless unduly prejudicial. Id. Notably, the Court in Newman concluded:
The fairness interest served by disclosure of the true alignment of the parties to the jury must be weighed against the countervailing interests in encouraging settlements and avoiding prejudice to settling parties. Since agreements to settle claims between parties who nevertheless remain at trial are virtually limitless in their possible permutations, this balance will necessarily be struck differently depending on the facts of each case. Thus, we must rely on the sound discretion of the trial court to ensure that, whatever the circumstances of a particular case, the integrity of the adversary process is preserved.
Id. at 151.
The record shows that the Holdemans, Brown, and C&G Express filed motions in limine requesting that the Section 537.065 settlement agreements the Holdemans entered into with Brown and C&G Express be excluded from evidence. Under the agreements, Brown and C&G Express agreed to pay the limits of their insurance in exchange for a non-execution agreement in which the Holdemans guaranteed they would not execute on Brown's or C&G Express's assets. All motions argued that these Section 537.065 settlement agreements were inadmissible under Missouri precedent. The Holdemans further argued that Stratman, Brown, and C&G Express were joint tortfeasors and, without the agreements, Brown and C&G Express would have still attempted to establish at trial that Stratman was solely at fault for the collision to lessen their own fault. Brown's motion argued that Brown had always taken the position that the accident was caused by Stratman and made no *54 liability admissions of any kind with respect to the agreements entered into pursuant to Section 537.065. Brown argued that attempts to introduce these confidential agreements into evidence at trial would be an outright attempt to cause the jury to infer an admission of negligence had been made previously by Brown or on Brown's behalf.
The court preliminarily ruled the settlement agreements would not be allowed into evidence but stated it would leave the matter open in the event that circumstances during trial allowed for their introduction.
After voir dire and opening statements, Stratman approached the court and argued it was obvious that there was no genuine dispute between the plaintiffs and defendants Brown and C&G Express. Stratman asked the court to revisit its order excluding the settlement evidence because the lack of genuine dispute between those parties compromised "the integrity of the judicial process." The Holdemans disagreed and stated that they intended to introduce evidence Brown did not stop in time to avoid the accident, and that they had told the jury as much in their opening statement. Both Brown and C&G Express maintained their positions that they shared no liability or blame. Brown indicated he was not contesting that damages occurred, stating, "I don't think Mr. Brown did anything wrong. That's my defense. I don't think it's smart to start nitpicking at damages for a defendant who feels they have no liability. That's a trial strategy decision I make."
The court ruled: "At this point, I've heard the plaintiff state in opening about that Mr. Brown did not stop in time. At this point I'm not detecting any conclusive [sic ] efforts. I understand it's counsel's trial strategy. Obviously, I'll keep watching and listening, and we'll see what happens."
During the third day of evidence, and just before Semke testified for the Holdemans, counsel for all parties approached the bench and announced that the parties had reached an agreement that Stratman could, for efficiency, have a continuing objection to the court's ruling excluding the Section 537.065 agreements, making it unnecessary for Stratman "to raise it each and every time that they wish to." The court responded:
I'm happy to give the continuing objection, but is-I think the standard is I have to determine that there's prejudice, correct? Right? That there's some sort of prejudice if I were to change my mind on that issue? ... Okay. Right now I'm not seeing anything, but if anything changes, Counsel, you are going to be obligated-I mean, I'm not going to make another ruling. Continuing objection, yes, but I'm just saying that if anything changes, then you need to object, because I can't rule until you come forward.
At the beginning of the fourth day of evidence, Stratman asked the court to revisit the order excluding evidence of the settlement agreements. Stratman believed prejudice had increased. The Holdemans argued they had never wavered from their position that Brown was partly at fault for the accident and could not be criticized for the evidence supporting Stratman's liability over Brown's. Furthermore, that much of the evidence Stratman suggested was prejudicial was elicited by Stratman himself. The court ruled:
At this point, I'm not seeing any positions that are dramatically adverse to the evidence presented thus far.... I'm seeing nothing that crosses that threshold into the area of prejudice that I feel like the jury is getting-that there would be an unfairness or unfair impression created with the jury. So, therefore, *55 the request of defendant Stratman will be denied at this time.
We find no abuse of discretion in the circuit court's refusal to allow Stratman to introduce settlement agreements to impeach witnesses and demonstrate party bias. It is evident from the trial transcript that the court carefully, conscientiously, and continuously evaluated the facts and circumstances of this particular case while weighing Stratman's concerns regarding the integrity of the judicial process against the danger of unfair prejudice if such evidence was introduced. The record supports the court's exclusion of the evidence.
Point two is denied.
Point III-Post-Accident Drug Test
In his third point on appeal, Stratman argues the circuit court erred in limiting him to using Brown's failed post-accident drug test for impeaching Brown's deposition testimony. Stratman argues that Brown opened the door to its wider use when Brown's counsel admitted in voir dire that Brown failed a post-accident drug test that was triggered by the event of the accident. Stratman contends that he should have been permitted to use this evidence to impeach the credibility of both the Holdemans' accident reconstruction expert and Brown's human factors expert, who testified Brown did nothing wrong in causing the collision. Stratman argues the wrongful exclusion of this impeachment evidence was prejudicial because the jury allocated 0% fault to Brown for the accident.
Pursuant to Secrist v. Treadstone, LLC , 356 S.W.3d 276 (Mo. App. 2011), Brown objected to the admission of evidence regarding his failed drug test due to its highly prejudicial nature and there being no evidence of Brown's impairment at the time of the accident. Brown asked the court for an order excluding the failed drug test for all purposes, including for impeachment of his deposition testimony. In response, Stratman acknowledged there was no evidence of Brown's impairment at the time of the accident, but believed the evidence was still admissible for impeachment. Stratman's counsel stated: "[W]e would stipulate that we're not using this evidence for purposes of intoxication ... it's for impeachment."
The circuit court ruled the evidence would be excluded to prove fault but allowed for impeachment of Brown's deposition testimony.
After the court's ruling, Stratman claimed Brown opened the door for use of the drug test for all purposes by mentioning it in voir dire. Yet, Stratman knew the issue would be raised in voir dire because it was discussed at the time the court made its ruling regarding Brown's motion in limine. After the court overruled Brown's request to exclude all reference to the drug test, Holdemans' counsel stated:
And so I think [Brown's counsel], to the extent, he wants to question about it on voir dire. He is entitled to say that we have entered into a stipulation in this case that the cocaine may be used to cross-examine, but it has no impact and it was not a contributing factor in this crash. But is there anybody for that reason alone, would automatically disbelieve Mr. Brown?
Holdemans' counsel also stated that, in light of Stratman's stipulation that there was no evidence of impairment or intoxication, "I think people are free to ask whatever questions they want in voir dire [.]" Stratman made no objection and never argued that inquiry on voir dire would open the door to its introduction for *56 all purposes.[7]
During voir dire , Brown's counsel inquired:
There was a post-accident test, post-accident drug test, that Mr. Brown did not pass. Okay? There's going to be no evidence in this case that he was impaired at the time of this accident. No evidence of impaired. But, in a separate category of evidence, you are likely going to hear that information, okay? Post-accident test, drug test failed. ... All right. Again, it's more or less just what I asked you on the two prior occasions, preconceived notions. My question is this-and be brutally honest with me-but is there anyone here knowing that information that you would tend to conclude, you know what, I automatically think Mr. Brown would have some fault for this accident?
Two venire persons indicated that this information would influence their perception of Brown's culpability. One venire person responded, "I do have an issue with that. My husband has a CDL. He works for Kansas City Power and Light. I just have an issue with the thought of if he had the test right after the accident, it just makes me feel like he would be at fault."
We find that Brown was entitled to expose prospective juror bias and this did not jeopardize the court's ruling that the evidence could only be used for impeachment. "The purpose of voir dire is to discover bias or prejudice in order to select a fair and impartial jury.... To this end, courts allow a liberal latitude in the examination of venirepersons." State v. Walker , 448 S.W.3d 861, 867 (Mo. App. 2014) (internal citation and quotation marks omitted). Here, Brown's voir dire question effectively exposed prospective jurors who stated that they would be unable to ignore the post-accident drug test when considering the issue of fault. The specific voir dire question posed by Brown did not open the door to admission of the drug test for other purposes.
We find no abuse of discretion in the court's limitation of Brown's post-accident failed drug test to impeachment of Brown's deposition testimony. Point three is denied.
Point IV-Expert Opinion Evidence
In his fourth point on appeal, Stratman contends the circuit court erred in excluding the testimony of expert Steve McKinzie on the basis of work product privilege. He argues the evidence was relevant, admissible, and not shielded by C&G Express's work product privilege because C&G Express gave Stratman permission to speak with this expert, thereby waiving its work product privilege. Stratman contends that no party can claim prejudice by its admission because the testimony would have been favorable to the Holdemans in their claim against the other defendants, *57 and the other defendants already knew of McKinzie's opinions.
C&G Express hired Steve McKinzie to complete an Engine Control Module ("black box") download on the truck Brown was driving at the time of the accident. Thereafter, C&G Express gave permission for McKinzie and Stratman to speak to each other. Stratman sought to introduce McKinzie's testimony at trial. The testimony was to include information regarding McKinzie's black box download as well as an investigation he conducted into the accident. Stratman designated McKinzie as a "non-retained" expert on his trial expert list, but never updated interrogatories to inform parties as to the subject matter of McKinzie's testimony.
C&G Express objected to McKinzie's testimony on the basis of work product privilege and surprise. McKinzie testified during Stratman's offer of proof that he had been retained by C&G Express and that all of the opinions he reached were formulated during that time period. When the court asked C&G Express' counsel what counsel's intent had been in permitting contact between McKinzie and Stratman, counsel explained that he only permitted this contact to allow Stratman to consider whether to hire McKinzie as his own expert; counsel explained that 'I certainly didn't expect [McKinzie] to ... advise them of his opinion' developed as a consultant to C&G Express."
The Holdemans' and Brown also objected to McKinzie's testimony. They informed the court they were under the impression that Stratman named McKinzie as a non-retained expert to address a foundation issue with the Engine Control Module download. This foundation issue was resolved before trial, which explained to them why interrogatories were never updated. They contended that any investigatory information McKinzie had regarding the accident was unknown to them. They insisted that they would have deposed McKinzie before trial had they known the subject matter of his testimony.
The trial court excluded McKinzie's testimony finding it to be C&G Express's work product and that Stratman had failed to update his interrogatories, creating surprise.[8]
We find no abuse of discretion in the court's refusal to allow McKinzie to testify. On this record, the circuit court was entitled to find that C&G Express permitted Stratman to speak with McKinzie for only a limited purpose, but did not intend a wholesale waiver of the work product immunity surrounding McKinzie's work as a consultant for C&G Express. Even if Stratman could prove C&G Express waived its work product immunity by allowing McKinzie to speak with Stratman, Stratman never updated interrogatories to explain the testimony McKinzie could be expected to give on Stratman's behalf. Interrogatories served on Stratman pursuant to Rule 56.01 requested that Stratman disclose the names and opinions of any retained or non-retained experts. Stratman's failure to comply with Rule *58 56.01 resulted in surprise to opposing parties. All parties were entitled to prior notice regarding McKinzie's expected testimony.[9]
Point four is denied.
Point V-Expert Testimony Regarding Loss of Income
In his fifth point on appeal, Stratman contends that the circuit court erred in permitting the Holdemans' economic expert, Brooke Liggett, to offer opinions on Mr. Holdeman's future economic income loss because the opinions were new, undisclosed, lacked foundation, and constituted unfair surprise. Stratman argues that, during discovery, Liggett offered opinions that relied on the opinions of vocational rehabilitation expert, Dr. Terry Cordray. Cordray was withdrawn as an expert before trial.[10] Stratman contends that, at trial, Liggett offered new opinions of Mr. Holdeman's anticipated future income loss without proper foundation or prior disclosure. Prior to Liggett's testimony, Stratman objected to the admission of Exhibit 235 regarding damages, Exhibit 236 regarding pre-trial lost earnings, and Exhibit 237 regarding post-trial lost earnings. These objections were overruled.
Liggett testified she was a forensic accountant/economist who deals with economic methodologies and theories in a legal setting to calculate damages. She explained that to arrive at present and future economic loss for Mr. Holdeman, she reviewed documents and conclusions that were reached by other professionals, including the life-care plan prepared by Dr. Yarkony, as well as government information such as the Consumer Price Index. On direct examination, Liggett testified that Mr. Holdeman would be completing a degree before the end of the year, "so based on Dr. Yarkony's opinion, Mr. Holdeman would be able to work part-time, twenty hours a week until the age of fifty-five. We calculated what he would have earned and these numbers represent the part-time earnings that Mr. Holdeman had the ability to earn."
On cross-examination, Stratman's counsel asked, "You would agree with me that if, for whatever reason, some or all of the information provided to you by Dr. Yarkony was wrong, specifically, as to the future care projections, your estimates of the present value of the cost could be wrong; fair statement?" Liggett responded, "Yes. If Dr. Yarkony were to change his plan and we were given a different planned value, yes, probably the numbers that we *59 calculated would be different." Stratman's counsel further inquired:
[STRATMAN'S COUNSEL]: Let's talk about your lost income projections, okay?
LIGGETT: Yes.
...
[STRATMAN'S COUNSEL]: Now, in your initial report, you were concluding or basing your estimates on the notion that Mr. Holdeman would be completely disabled and unable to work; fair statement?
LIGGETT: Yes.
[STRATMAN'S COUNSEL]: But that's been changed, hasn't it?
LIGGETT: Yes, it has.
...
[STRATMAN'S COUNSEL]: You are assuming, though, it's a fair statement that Mr. Holdeman is unable to work full-time?
LIGGETT: Yes. I am assuming that based on the opinion of Dr. Yarkony.
...
[STRATMAN'S COUNSEL]: Now you would agree with me that in your initial report you estimated Mr. Holdeman's future lost income at $2,126,490?
LIGGETT: That number would represent the post-trial lost income.
...
[STRATMAN'S COUNSEL]: And in your new projections the future lost income is $1,866, 862. Is that a fair statement?
LIGGETT: Yes.
[STRATMAN'S COUNSEL]: Do you recall in your deposition to us, I asked if you assumed that Mr. Holdeman was able to work part-time, you said it would reduce his lost income claim by about $500,000. Do you remember that?
LIGGETT: Yes I do.
Stratman's counsel asked why the reduction for part-time employment had changed from $500,000 to $259,628. Liggett explained that when Stratman's counsel previously asked that question, Stratman's counsel had only asked Liggett "to run a quick calculation," and that is what she did. She further explained the former calculation was based on the assumption that the part-time employment would be until the retirement age of sixty-seven. Her new calculation was based on Dr. Yarkony's opinion that Mr. Holdeman could work until the age of fifty-five.
We find that Stratman had knowledge, pre-trial, of Liggett's opinions regarding Mr. Holdeman's future lost income if Mr. Holdeman were capable of working part-time. Further, Stratman was always on notice that Liggett's base figures related to future lost income were based on another professional's opinion of Mr. Holdeman's ability to work, and that Liggett's calculations as to future lost income would change if Mr. Holdeman's ability to work changed. Liggett's expertise was as an economist/accountant, not an expert who had first-hand knowledge of Mr. Holdeman's capacity to work. Stratman makes no claim on appeal that Liggett's economic or accounting methodology for calculating the present value of Mr. Holdeman's future lost income changed in any way between discovery and trial.[11] Moreover, Stratman evidenced his understanding, pre-trial, that Liggett's calculations would *60 fluctuate depending on Mr. Holdeman's employability when he asked Liggett to describe how her projections would change if it was determined that Mr. Holdeman could work part-time. Dr. Yarkony's opinions were already before the court when Liggett testified. There is no suggestion by Stratman that Dr. Yarkony's opinions came as a surprise or that Stratman was unaware at the time of trial that Mr. Holdeman was finishing a degree and planned to find future, part-time employment.
We find no abuse of discretion in the court allowing Liggett's testimony. Stratman fails to prove this testimony truly came as a surprise or that any surprise he may have experienced was prejudicial. Additionally, Liggett's trial testimony reduced Mr. Holdeman's future lost income figures by nearly $260,000 from her previous estimate, further evidencing no prejudice.
Point five is denied.
Conclusion
We conclude that the circuit court did not abuse its discretion in, 1) prohibiting Stratman from impeaching the credibility of the Holdemans' liability expert with evidence of settlement agreements, 2) excluding evidence of settlement agreements to impeach witnesses and demonstrate party bias, 3) limiting use of defendant Brown's failed post-accident drug test to impeachment of Brown's deposition, 4) excluding the testimony of Stratman's "non-retained" expert, and 5) permitting Liggett's expert opinions on the Holdemans' claim of future loss of income.
We affirm the circuit court's judgment.
All concur.

Because they share the same last name, Steven Holdeman and Sarah Holdeman will hereafter be referenced as Mr. Holdeman and Mrs. Holdeman respectively.

The accident reconstruction expert was provided a copy of truck driver Brown's deposition that contained the settlement agreement as an exhibit. Semke stated in a deposition: "I was provided and did glance through but I didn't draw any legal conclusions from it at all."

"An offer of proof is made after an unfavorable ruling and must specifically show: (1) what the proffered evidence would be; (2) its object and purpose; and (3) all the facts necessary to establish its relevance and admissibility." State v. Prine , 456 S.W.3d 876, 882 (Mo. App. 2015) (internal quotation marks and citations omitted).

All statutory references are to the Revised Statutes of Missouri, as supplemented through August of 2017, unless otherwise noted.

Stratman was not barred from introducing relevant evidence supporting Stratman's contention that Semke's opinions were unreasonable. Stratman promised the jury in opening statements that the evidence would show that Brown had the last and best opportunity to avoid the accident. Stratman promised the jury that he would produce his own accident reconstruction expert to refute the Holdemans' evidence. He never produced this expert.

Quoting Carter v. Tom's Truck Repair, Inc. , 857 S.W.2d 172, 175 (Mo. banc 1993).

Stratman's failure to object to the voir dire questioning likely waived his present claim. He never alerted the court that he believed the voir dire questioning opened the door to using the drug test evidence for purposes other than impeachment of Brown's deposition until, in spite of the court's order, Stratman asked the Holdemans' accident reconstruction expert about it on cross examination. Stratman asked, "So you don't think Roger Brown did a thing wrong in this case, do you?" Semke responded, "We've already been through this. I went through his log books. When I looked at his truck, he had an air leak on an air valve on the front right. It was significant." Stratman challenged, "Are you aware, Mr. Semke, that they have a positive drug screen?" Only after Brown's counsel objected and the court reprimanded Stratman for violating the court's order did Stratman argue that the door had been opened in voir dire for expanded use of the evidence. Nevertheless, as we prefer to dispose of a claim on the merits, we proceed to review.

The court ruled:
And I've looked a little bit at the case law and I think you're right in that if it's attorney-client work product, undertaken on your behalf; then as a consultant or for whatever reason, they would not be able to introduce that. I do think that there are other issues here in the nature of surprise, generally speaking, you can-we went over that the rule says that you've kind of got to depose these folks at your own risk. There was not an updating of the interrogatory. And I think the understanding of the parties, although maybe not intentional, there was some confusion that I do think resulted in the surprise. But, in any case, it's attorney-client work product and you can't get into that.

Additionally, the testimony Stratman intended to elicit from McKinzie (that Brown had 1600 feet of sight distance and the brake on the truck was capable of stopping the truck within that distance) was the same information Stratman stated his retained accident reconstruction expert would testify to. Stratman never called his retained expert to testify, however other witnesses, including Officer Phelps, Semke, and William Messerschmidt, testified to substantially similar information. "A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence." Saint Louis Univ. v. Geary , 321 S.W.3d 282, 292 (Mo. banc 2009) (internal quotation marks and citations omitted).

At trial, the Holdemans requested that no evidence be allowed that they declined to call previously designated but withdrawn expert, Dr. Cordray. The Holdemans indicated that they had withdrawn Dr. Cordray, a vocational rehabilitation expert who had determined that Mr. Holdeman was completely disabled and could not work, because two physicians, Dr. Scelza and Dr. Yarkony, would testify that Mr. Holdeman could achieve part-time employment. At the time of trial, Mr. Holdeman had nearly completed a degree in gunsmithing.

Stratman relies on Pasalich v. Swanson , 89 S.W.3d 555 (Mo. App. 2002), a medical malpractice claim involving a defendant doctor who changed his testimony at trial regarding the medical cause of plaintiff's injuries, to support his claim that the court erred in allowing Liggett's testimony. A defendant doctor's changed opinion regarding the root cause of an injury is significantly different than an economist's updated calculation of damages based on data received by other sources.