

# SUPREME COURT OF MISSOURI
## en banc

EVE SHERRER,                                     )      *Opinion issued October 13, 2020*

                        Appellant,          )

v.                                         )      No. SC97465

BOSTON SCIENTIFIC CORPORATION    )
and C.R. BARD, INC.,                 )

                        Respondents.     )

## APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
The Honorable Robert M. Schieber, Judge

**PER CURIAM**

Eve Sherrer appeals a judgment in favor of Boston Scientific Corporation (BSC) and C.R. Bard Inc. after a jury trial on her claims of negligence, product defect, and failure to warn related to their design and manufacture of polypropylene mesh slings that were surgically implanted in Sherrer. On appeal, Sherrer claims the circuit court erred in: (1) prohibiting her from presenting evidence of Bard's prior convictions; (2) allowing the display of portions of her original petition and its allegations of negligence against two defendants with whom she had settled and dismissed from the case; (3) allowing cross-examination of her and other witnesses with allegations and claims in her original petition;

and (4) denying a mistrial when information was presented to the jury regarding her settlements with the two dismissed defendants.

The circuit court did not err in excluding evidence of Bard's prior convictions because section 491.050,[1] authorizing impeachment with prior criminal convictions, is inapplicable to corporations and the convictions were not admissible to rebut good-character evidence. Her original petition's allegations and claims against former defendants were inconsistent pleadings permitted by Rule 55.10 and could not be used against her as admissions of a party opponent or as her prior inconsistent statements. Nevertheless, the circuit court's errors in not sustaining Sherrer's objections to BSC's and Bard's use of her claims against the dismissed defendants were not prejudicial because similar evidence was admitted without objection. Neither did the circuit court manifestly abuse its discretion denying Sherrer's request for a mistrial after Bard displayed to the jury highly prejudicial evidence of her settlements with the dismissed defendants. The circuit court's judgment in favor of BSC and Bard is affirmed.

**Factual and Procedural Background**

Sherrer had surgery at Truman Medical Center-Lakewood ("TMC"), on October 28, 2010, for stress urinary incontinence. Her surgeons, Dr. Peter Greenspan and Dr. Kristen Kruse, were employed by University Physician Associates ("UPA"). During the surgery, Dr. Greenspan implanted a Solyx polypropylene mesh sling, manufactured and designed by BSC. Sherrer alleges her condition worsened immediately after the surgery, and, in

---

[1] All statutory references are to RSMo 2000, unless otherwise noted.

January 2011, Dr. Richard Hill operated to remove portions of BSC's Solyx sling and implant an Align polypropylene mesh sling, manufactured and designed by Bard. Sherrer alleges her condition did not improve and she suffered painful complications.

In October 2012, Sherrer filed a petition asserting medical negligence claims against TMC and UPA. Sherrer alleged in the petition that TMC and UPA were liable for the negligent care and treatment related to her 2010 surgery, which was provided to her by the agents, servants, and employees of TMC and UPA. Specifically, she claimed TMC and UPA were negligent in:

(1) allowing Dr. Kruse[2] to perform the Solyx sling implant when the doctor lacked the necessary skill;

(2) failing to make Sherrer aware more skilled physicians were available to perform the surgery;

(3) failing to obtain adequate informed consent from Sherrer, by failing to disclose the amount of skill and experience Dr. Kruse had and failing to discuss the risks of implanting the mesh products and alternative treatment;

(4) failing to follow the manufacturer's instructions in placing the sling; and

(5) failing to attach the sling's right-side anchor.

---

[2] At the time she filed her petition, Sherrer did not know Dr. Peter Greenspan participated in her surgery and performed the Solyx sling implant and that Dr. Kruse performed the remainder of the 2010 surgery.

The petition further alleged that, as a result of TMC and UPA's negligence, Sherrer sustained physical and mental pain and suffering and incurred medical expenses for her surgeries and ongoing medical care.

In 2013, she filed an amended petition that restated, nearly verbatim, the allegations of her negligence claims against TMC and UPA and added six claims against BSC and Bard as manufacturers and designers of the polypropylene mesh slings, including claims for negligence, design and manufacturing defects,[3] and failure to warn. In April 2014, while litigation was pending, Sherrer underwent a third surgery to remove the Solyx and Align slings.[4] The following November, she settled her medical malpractice claims against TMC and UPA and dismissed her claims against them.

Sherrer's claims against BSC and Bard were tried to a jury from November 2015 through February 2016. She submitted claims for negligence, product defects, and failure to warn to the jury, and the jury returned verdicts on these claims in favor of BSC and Bard. The circuit court entered judgment for BSC and Bard. Sherrer appealed, and this Court

---

[3] Sherrer alleged the Solyx and Align slings had several defects. She alleged, among other defects, the slings contained polypropylene mesh, despite the mesh manufacturer's medical application caution in its material safety data sheet that polypropylene is biologically incompatible with human tissue and promotes a negative immune response, and the slings tended to gradually elongate, degrade, or fragment over time, causing chronic and intractable pain. In addition to presenting evidence at trial in support of the mesh manufacturer's caution, she also presented evidence that, due to the dangers of implanting polypropylene in the body, the defendants had to procure surreptitiously their supplies of polypropylene.

[4] Sherrer testified at trial that she had a fourth surgery that included another sling procedure using her own tissue.

ordered the cause transferred after opinion by the court of appeals. Mo. Const. art. V, sec. 10.

Sherrer raises four claims of error on appeal. In her first and second points of error, Sherrer claims the circuit court erred in sustaining objections to admission of Bard's criminal convictions because the convictions were admissible to impeach its credibility pursuant to section 491.050 and to contradict and rebut evidence of its good character. In her third point, she asserts the circuit court abused its discretion in permitting Bard and BSC to show the jury the caption of her abandoned original petition and its allegations of TMC's and UPA's negligence and to impeach her and other witnesses with those allegations. Finally, she claims the circuit court manifestly abused its discretion in failing to declare a mistrial after Bard displayed to the jury evidence of her settlements with TMC and UPA.

## Standard of Review

The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be disturbed absent clear abuse of discretion. *Cox v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015). "A ruling constitutes an abuse of discretion when it is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (internal quotations omitted). By contrast, a circuit court's interpretation of a statute is a question of law reviewed *de novo*. *Dodson v. Ferrara*, 491 S.W.3d 542, 551 (Mo. banc 2016).

A circuit court's denial of a mistrial is reviewed for a "manifest abuse of discretion." *Spence v. BNSF Ry. Co.*, 547 S.W.3d 769, 780 (Mo. banc 2018). "To establish a manifest abuse, there must be a grievous error where prejudice otherwise cannot be removed." *St. Louis Univ. v. Geary*, 321 S.W.3d 282, 293 (Mo. banc 2009).

## I. Prior Convictions Not Admissible

Sherrer asserts the circuit court erred when it excluded evidence of Bard's prior criminal convictions because (1) the evidence was admissible to impeach Bard's credibility as a matter of right pursuant to section 491.050; and (2) the evidence became admissible during the course of trial as negative character evidence to rebut evidence of Bard's good corporate character. Bard argues section 491.050 does not apply to criminal convictions of a corporation. Bard also argues it did not present evidence of its good corporate character, so evidence of its prior convictions did not become admissible in the course of trial.

Generally, a circuit court has discretion to control the bounds of cross-examination, but its control is limited by section 491.050, which gives an absolute right to show a prior conviction of a witness. *Fisher v. Gunn*, 270 S.W.2d 869, 876 (Mo. 1954). Sherrer claims the circuit court failed to recognize, under section 491.050, she had the absolute right to impeach Bard's credibility with evidence of its prior federal convictions for 391 counts of conspiracy, mail fraud, false statement, and adulterated product/failure to file medical device reports.

Section 491.050 provides, in relevant part:

6

> Any person who has been convicted of a crime is, notwithstanding, a competent witness; however, any prior criminal convictions may be proved to affect his credibility in a civil or criminal case . . . . Such proof may be either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer.

"When interpreting a statute, this Court is guided by the legislature's intent, as indicated by the statute's plain language." *Desai v. Seneca Specialty Ins. Co.*, 581 S.W.3d 596, 601 (Mo. banc 2019). Sherrer contends ascertaining the legislature's intent from the language of section 491.050 requires consideration of section 1.020(12), RSMo Supp. 2013, which defines "person" to include corporations, so a corporation may be impeached by evidence of its prior conviction. Section 1.020(12), RSMo Supp. 2013, does not provide that "person" is always synonymous with "corporation." Rather, it provides that "person" *may* include corporations, but not if the inclusion of "corporation" is "plainly repugnant to the intent of the legislature or to the context thereof[.]" Section 1.020, RSMo Supp. 2013.

To discern the legislature's intent, the Court may "consider the problem that the statute was enacted to remedy." *United Pharmacal Co. of Mo., Inc. v. Mo. Bd. of Pharmacy*, 208 S.W.3d 907, 912 (Mo. banc 2006). When section 491.050 was first enacted, the legislature's purpose was to remove a common law consequence of conviction. Under the common law, all witnesses convicted of "infamous crimes" were incompetent to testify in Missouri. *See State v. Smith*, 28 S.W. 181, 182 (Mo. 1894). In 1895, the legislature enacted a statute making a convicted individual competent to testify but allowed for the admission in evidence of any prior conviction to impeach the individual's

7

credibility. Mo. Laws 1895 section 1, section 8944b, at 284.[5] This enactment made "a very material alteration in the rules of evidence" at the time. *State v. Blitz*, 71 S.W. 1027, 1030 (Mo. 1903). The 1895 statute is virtually identical to present-day section 491.050. There is nothing in the history of section 491.050 to indicate the legislature intended the 1895 law to affect a corporation, and no case has been found applying the statute to a corporation.

That conclusion is further supported by the examination of the context of the word "person" in section 491.050, as required by section 1.020. In section 491.050, the reference is to a person being competent to be a witness. A witness is one who testifies under oath or affirmation in person, by deposition, or by affidavit. *Witness*, BLACK'S LAW DICTIONARY (11th ed. 2019).

> A witness must have:
>
> (1) a present understanding of, or the ability to understand upon instruction, the obligation to speak the truth; (2) the capacity to observe the occurrence about which testimony is sought; (3) the capacity to remember the occurrence about which testimony is sought; and (4) the capacity to translate the occurrence into words.

*State v. Robinson*, 835 S.W.2d 303, 307 (Mo. banc 1992) (quotations omitted). And generally, witnesses "may only testify to those matters of which the witness has personal

---

[5] Mo. Laws 1895 section 1, section 8944b, at 284, provides:
> Any person who has been convicted of a criminal offense is, notwithstanding, a competent witness; but the conviction may be proved to affect his . . . [credibility], either by the record or by his own cross-examination, upon which he must answer any question relevant to that inquiry, and the party cross-examining shall not be concluded by his answer.

(Alterations in original).

first-hand knowledge." *State v. Taylor*, 466 S.W.3d 521, 529 (Mo. banc 2015). A corporation is unable to meet any of these criteria. "A corporation, being an artificial person created by operation of law, can act only through its officers, directors and agents." *Schneider v. Schneider*, 146 S.W.2d 584, 589 (Mo. 1940).

Because section 491.050 renders any convicted "person" a competent "witness" and corporations cannot be witnesses, interpreting "person" to include corporations would be plainly repugnant to the legislature's intent and the context of section 491.050. When a corporate representative testifies on a corporation's behalf, the right to impeach provided by section 491.050 is the right to impeach the corporate representative's credibility as a witness by evidence of the corporate representative's prior convictions. It is not the right to impeach the corporation's credibility with evidence of the corporation's prior convictions.

Alternatively, Sherrer argues evidence of Bard's criminal convictions was admissible to contradict or rebut Bard's evidence of good corporate character or became admissible, under the curative admissibility doctrine, to rebut inadmissible evidence of Bard's good corporate character. Evidence presented to highlight or create a contradiction and evidence admitted under the doctrine of curative admissibility implicate distinct evidentiary principles.

Impeachment with contradictory evidence refers to impeachment with evidence "directed to the accuracy of a witness's testimony by supplying contradictory factual evidence." *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 n.4 (Mo. banc 2010). It is evidence that the witness "made a factual error" in his or her testimony. ROGER PARK & TOM

9

LININGER, The New Wigmore: Impeachment and Rehabilitation § 4.1 (1st ed. Supp. 2020). "Evidence contradicting a witness's testimony not only supplies direct factual evidence but also may be used to undermine the confidence in the reliability of the witness's testimony." *State v. Taylor*, 466 S.W.3d 521, 530 (Mo. banc 2015). Contradiction evidence is not admissible if the contradiction relates only to a collateral matter. *Id.* A matter is collateral if it is not pertinent to the issues being tried and offered solely to contradict the witness and impeach the witness's credibility. *Id.*

The curative admissibility doctrine, on the other hand, "applies when one party introduces inadmissible evidence and allows the opposing party to introduce otherwise inadmissible evidence to rebut or explain inferences raised by the first party's evidence." *State v. Taylor*, 298 S.W.3d 482, 493 (Mo. banc 2009); *accord Phoenix Redevelopment Corp. v. Walker*, 812 S.W.2d 881, 886 (Mo. App. 1991). The curative evidence, however, must be confined to the evidentiary point to which the inadmissible evidence was directed, *State ex rel. State Highway Comm'n v. Lynch*, 471 S.W.2d 261, 266 (Mo. banc 1971), and a circuit court has discretion as to whether any curative evidence will be allowed, *see Jefferson v. Biggar*, 416 S.W.2d 933, 937 (Mo. 1967).

Sherrer points to several instances during trial that allegedly gave rise to her right to contradict or opened the door to curative evidence of Bard's bad corporate character. She first complains of several assertions made by Bard's counsel during opening statements. Bard's counsel stated:

> Bard fully complied with the FDA regulations and safety standards in bringing the Align to market.

\* \* \*

Bard makes devices that are life improving, life enhancing, lifesaving in different types.

*  *  *

They make surgical products we're talking about, like the Align that help enhance the quality of life.

*  *  *

Bard extensively tested the Align for safety.

*  *  *

The FDA set the guidelines and the rules and Bard fully complied.

*  *  *

Bard complied with all the FDA regulations and standards.

*  *  *

[T]o be able to stand here as a woman and defend this product and defend this company and to know that these are helping millions of women is really rewarding.

Sherrer claims she was entitled to contradict these statements with evidence of Bard's prior convictions, but evidence of Bard's prior convictions does not contradict any of the assertions stated in Bard's opening statement. The convictions are evidence of Bard's misconduct in the 1980s related to heart catheter devices manufactured by a division that Bard sold years before the Align was brought to market. Sherrer was not entitled to contradict the statements of Bard's attorney with evidence of Bard's prior convictions for unrelated conduct that was not otherwise pertinent to the issues being tried.

11

Sherrer next claims that, under the curative admissibility doctrine, Bard's opening statement opened the door to evidence that rebuts its good corporate character. Her claim is based on the premise, first, that the comments of Bard's attorney in its opening statement regarded Bard's character and were intended to convince the jury that it would not provide an unsafe product and, secondly, once the statements were made, Sherrer was entitled to introduce evidence of Bard's poor character in rebuttal.

Although an opening statement is not evidence, *State v. McFadden*, 369 S.W.3d 727, 747 (Mo. banc 2012), "a party can open the door to the admission of evidence with a theory presented in an opening statement," *State v. Wood*, 580 S.W.3d 566, 577 (Mo. banc 2019) (internal quotation omitted). Still, "[m]uch discretion rests in the trial court in such matters," *Dickerson v. St. Louis Pub. Serv. Co.*, 286 S.W.2d 820, 827 (Mo. banc 1956), and little unfair prejudice could have resulted from these fleeting statements in the context of a five-week trial. The circuit court did not abuse its discretion in excluding evidence of Bard's prior convictions offered to rebut an inference that Bard possesses good corporate character.

Sherrer next asserts the circuit court erred in not allowing her to contradict the testimony of Bard's president and chief operating officer, John Weiland. As a witness for Bard, he testified that "acting responsibly and with the safety of patients in mind, [Bard] would always do [its] own independent testing." Sherrer elicited testimony from Weiland that he takes telling the truth seriously, truth-telling is an important thing in business, and it is important for everyone to be truthful and honest. As before, evidence of Bard's prior convictions cannot be used to contradict Weiland's testimony. Evidence of Bard's

12

convictions from the 1980s relating to heart catheters does not show any factual errors in Weiland's testimony.

Similarly, Weiland's testimony did not open the door to curative evidence of Bard's poor character. A party "cannot take advantage of the doctrine of curative admissibility to counter testimony [it] adduced." *Straughan v. Murphy*, 484 S.W.2d 465, 469 (Mo. 1972). The circuit court did not abuse its discretion in excluding evidence of Bard's prior convictions offered to contradict Mr. Weiland's testimony or rebut evidence of Bard's character.

Sherrer next claims she was entitled to introduce evidence of Bard's prior convictions when Roger Darois, a retired Bard employee, testified Weiland was "one of the most upstanding guys [he had] ever met" and Weiland had won an award in 2012 "for proven honesty, hard work, and perseverance in the face of adversity" that had also been awarded to "folks like" Oprah Winfrey and Dwight Eisenhower. Sherrer claims this evidence served to bolster Bard's good character by virtue of its association with Weiland. This testimony is not evidence of Bard's character but rather evidence of Weiland's character. Its introduction does not open the door to curative evidence of Bard's prior convictions, and the convictions do not contradict this testimony. Therefore, the circuit court did not abuse its discretion in excluding evidence of Bard's prior convictions to contradict or cure evidence introduced in Darois's testimony.

Finally, under cross-examination by Sherrer's counsel, Darois testified to Bard's motive in keeping confidential the fact it used polypropylene in its finished devices. Darois testified it was out of concern for patient safety, stating "[S]urgeons need these products.

13

They're trained on these products. They depend on these products. So if they have to use some other device they're not trained on or familiar with, it could impact patient safety in those situations." Sherrer claims the circuit court erred in excluding evidence of Bard's prior convictions offered to contradict or cure this testimony.

The circuit court did not err in excluding evidence of Bard's prior convictions. The evidence does not contradict Weiland's testimony and has no bearing on Bard's motives in keeping confidential its use of polypropylene in its mesh slings. Nor could Bard's criminal convictions be introduced to cure Darois's testimony because it does not pertain to the same evidentiary point as his testimony – Bard's motive for keeping its use of polypropylene confidential. For these reasons, the circuit court did not abuse its discretion in excluding evidence of Bard's prior convictions offered to contradict or to cure the introduction of inadmissible evidence.

## II. Use of Abandoned Petition Improper but Not Prejudicial

Sherrer next asserts the circuit court erred in allowing BSC and Bard to use portions of her abandoned original petition, during their opening statements and examination of witnesses, to impeach her credibility and the validity of her claims. Specifically, she asserts the circuit court erred in permitting BSC and Bard to (1) display the caption of her original petition and allegations in that petition against TMC and UPA, with which she had settled, and (2) use allegations in her original petition to impeach her testimony and the testimony of other witnesses. She argues such use of her abandoned original petition was improper because the allegations in her original petition were "live" allegations, as they were restated in her amended petition, and were allegations and pleas of alternative, inconsistent claims

14

permitted by Rule 55.10 that cannot be used to impeach the validity of the other claims she made.

Sherrer filed her original petition in October 2012. In that petition, she alleged medical negligence claims against TMC and UPA. In May 2013, she filed an amended petition restating nearly verbatim her medical negligence claims against TMC and UPA and adding multiple claims against BSC and Bard. Before trial, Sherrer settled her claims against TMC and UPA and dismissed them from the action.

Throughout the jury trial, BSC and Bard defended against Sherrer's claims by asserting her injuries were caused by the doctors who performed her surgeries and that she had other physical conditions that caused her physical complaints and pain. In furtherance of this defense, BSC and Bard displayed the caption and allegations of her abandoned original petition to show Sherrer filed medical negligence claims against TMC and UPA for the same injuries she claimed at trial were caused by BSC and Bard. This began when BSC displayed the caption of Sherrer's abandoned original petition during its opening statement[6] and referenced the fact Sherrer sued TMC and UPA before adding Bard and BSC as defendants. In its opening statement, Bard also displayed the caption of Sherrer's abandoned original petition, stated she filed a lawsuit against TMC and UPA in October

---

[6] Sherrer filed a motion for leave to supplement the legal file on appeal with the PowerPoint slides BSC and Bard displayed to the jury in their opening statements. Although the slides were displayed to the jury and are relevant to her claims on appeal, they were not marked as exhibits or admitted in evidence in the circuit court. Because the slides were not in the record before the circuit court, they cannot be considered on appeal. *State v. Tokar*, 918 S.W.2d 753, 762 (Mo. banc 1996); *see also DeGennaro v. Alosi*, 389 S.W.3d 269, 275 n.5 (Mo. App. 2013). Sherrer's motion to supplement the record on appeal is overruled.

15

2012, and displayed and discussed portions of the original petition's allegations of negligence against TMC and UPA. The defendants also used allegations in Sherrer's original petition against TMC and UPA – allegations that were restated in Sherrer's amended petition – to impeach her and other witnesses.

BSC and Bard asserted, in the circuit court and on appeal, that their use of Sherrer's statements in her initial petition was proper, in some instances, because statements in her original petition were admissions of a party opponent[7] or inconsistent statements that could be used to impeach her position at trial.[8] BSC and Bard assert their use of Sherrer's abandoned original petition was also proper under *Carter v. Matthey Laundry & Dry Cleaning Co.*, 350 S.W.2d 786, 791 (Mo. 1961), which held an abandoned pleading may be used to show that a claim added in a subsequent pleading is an afterthought or made in

---

[7] "Admissions of a party opponent" have historically been referred to as "admissions against interest" or referenced simply as "admissions." *See United Servs. of Am., Inc. v. Empire Bank of Springfield*, 726 S.W.2d 439, 443-44 (Mo. App. 1987). In this opinion, such admissions will be called "admissions of a party opponent."

[8] BSC's and Bard's use of Sherrer's statements in her original petition for impeachment with an inconsistent statement did not always follow the approved mode for such use. The proper foundation for impeachment with an inconsistent statement is to:

> first ask the witness whether he or she made the statement, quote the statement, and point out the precise circumstances under which it was allegedly made, including to whom the witness spoke and the time and place of the statement. The witness must then be given a chance to refresh his [or her] recollection of the prior statement and to admit, deny, or explain it.

*Menschik v. Heartland Reg'l Med. Ctr.*, 531 S.W.3d 551, 559-60 (Mo. App. 2017) (internal quotations and citations omitted). If the pleader-witness denies or equivocates regarding the making of a prior inconsistent statement, the legal pleading may be admitted as extrinsic evidence to prove the inconsistent statement. *Maloy v. Cabinet & Bath Supply, Inc.*, 187 S.W.3d 922, 926-27 (Mo. App. 2006).

16

bad faith. Specifically, BSC and Bard used Sherrer's original petition to suggest to the jury her subsequently filed claims against BSC and Bard were not meritorious or in good faith because she originally sued only TMC and UPA and, in her original petition, said TMC and UPA were responsible for the same injuries she was now claiming were caused by BSC and Bard.

BSC and Bard are correct that a statement in a pleading is admissible if it meets the requirements of a rule of evidence. *Lammers v. Greulich*, 262 S.W.2d 861, 865 (Mo. 1953); *see also Lewis v. Wahl*, 842 S.W.2d 82, 86 n. 4 (Mo. banc 1992). An admission of a party opponent is a statement by a party that consciously or voluntarily acknowledges the existence of certain facts unfavorable to, or inconsistent with, the position taken by the party at trial and relevant and favorable to the cause of the opposing party who offers the statement. *Thomas v. Harley-Davidson Motor Co. Grp., LLC*, 571 S.W.3d 126, 138-39 (Mo. App. 2019). A statement in a pleading may also be used to impeach the pleader's inconsistent testimony at trial. *Lewis*, 842 S.W.2d at 86.

Use of a statement in a pleading as an admission of a party opponent or a prior inconsistent statement is subject to two limitations, however. These limitations are the bases of Sherrer's objections. First, a statement must be one of operative fact and not a legal conclusion to qualify as admission of a party opponent or an inconsistent statement used to impeach. *Id.* at 87.

Second, facts alleged in *inconsistent* pleadings may not be used as admissions of a party opponent, *Johnson v. Flex-O-Lite Mfg. Corp.*, 314 S.W.2d 75, 79 (Mo. 1958), or for impeachment of the pleader with a prior inconsistent statement, *Lewis*, 842 S.W.2d at 87.

17

Inconsistent pleadings are those that assert alternative allegations against multiple parties[9] or disjunctive specifications of negligence or fault against any party.[10]  *Id.*  "Where the trial testimony of a party supports one version of an inconsistent pleading, allowing the opponent to impeach with a corresponding inconsistent allegation of the pleading [or to use as an admission] would, at the least, inhibit the utilization of Rule 55.10."  *Id.* Consistent with the purpose of Rule 55.10, multiple, inconsistent pleas may not be used as admissions by a party opponent upon another issue in the same case or as inconsistent statements, *Flex-O-Lite*, 314 S.W.2d at 79, because alternative allegations against multiple parties and disjunctive specifications of negligence or fault against a single party in a single action are only conditionally asserted to be true and lack the characteristics inherent in admissions of a party opponent.  *Lewis*, 842 S.W.2d at 87.

---

[9] Although *Lewis* used a logically inconsistent pleading, one which alleges each of multiple defendants is the sole cause of the plaintiff's injuries as an example of an inconsistent pleading, 842 S.W.2d at 87, in *Macheca v. Fowler*, this Court applied the same rule to a pleading that asserted multiple, but not inconsistent, claims against multiple parties, *see* 412 S.W.2d 462, 465 (Mo. 1967).  Inconsistent pleadings are not limited to pleadings that involve conflicting factual allegations.

[10] Rule 55.10 permits the filing of inconsistent pleadings:

> A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. . . .  A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or equitable grounds.

Rule 55.10.  The rule permits a party to submit all the party's claims in a single action and allows the party to state as many separate claims or defenses as the party has, regardless of consistency. *Becker v. St. Charles Boat & Motor Inc.*, 131 S.W.3d 868, 871 (Mo. App. 2004).

18

The first limitation that statements in a pleading must be statements of fact and not legal conclusions applies equally to statements in live and abandoned pleadings. *Fahy v. Dresser Indus., Inc.*, 740 S.W.2d 635, 642 (Mo. Banc 1987); *Wahl v. Cunningham*, 56 S.W.2d 1052, 1059 (Mo. banc 1932). The second limitation that inconsistent pleadings cannot be used as admissions against a party opponent or for impeachment with an inconsistent statement has been applied consistently to statements in live pleadings. *See Lewis*, 842 S.W.2d at 87; *Flex-O-Lite*, 314 S.W.2d at 79; *Macheca*, 412 S.W.2d at 465. But there has been inconsistent application of the inconsistent-pleadings limitation to abandoned pleadings, like Sherrer's original petition.[11]

The uncertainty of whether inconsistent pleas in abandoned pleadings can be used as admissions against interest and for impeachment with an inconsistent pleading is fueled by two decisions of this Court. In *Flex-O-Lite*, the Court stated it was not concerned with pleadings abandoned or superseded by amendment as "the pleadings offered for impeachment purposes were those upon which the case was being tried." 314 S.W.2d at 79. Again, in *Lewis*, the Court stated, "In considering the admissibility of pleadings as an inconsistent statement, we have generally distinguished between abandoned pleadings and pleadings from other cases on the one hand, and pleadings which are live and active in the present lawsuit on the other." 842 S.W.2d at 86. Because the error claimed involved statements in a live pleading, the Court did not address "whether and to what extent the

---

[11] Sherrer's original petition was abandoned when she filed an amended petition. *State ex rel. Crowden v. Dandurand*, 970 S.W.2d 340, 342 (Mo. banc 1998).

19

rules for the use of pleadings may differ with respect to abandoned pleadings or pleadings from other cases." *Id*. The distinction may have been drawn because the Court in *Carter* rejected applying to abandoned pleadings the rule that inconsistent, multiple pleas in a live pleading "may not be used as an admission upon another issue in the same case," stating simply that *Flex-O-Lite*, the authority cited for the rule, concerned a live pleading. 350 S.W.2d at 792.

A few years later, however, in *Jimenez*, the Court ruled contrary to *Carter* when it held inconsistent allegations in an abandoned pleading should not be admitted when admitting the pleading would infringe on a party's right to plead in the alternative.[12] *Jimenez*, 445 S.W.2d at 317. The Court ruled that to permit a plaintiff to admit a statement in the defendant's abandoned answer, pleading an alternative defense of contributory negligence, as an admission of a party opponent would "negate the defendant's right to plead in the alternative given by Supreme Court Rule 55.12."[13] *Id.*

The court of appeals has also ruled inconsistently on the issue. In *Brandt v. Csaki*, 937 S.W.2d 268 (Mo. App. 1996), and *Lazane v. Bean*, 782 S.W.2d 804, 805 (Mo. App. 1990), the court of appeals cited *Carter* and ruled that inconsistent pleas in an abandoned pleading are admissible as admissions against interest and inconsistent statements of the pleader. In contrast, in *Danneman v. Pickett*, 819 S.W.2d 770, 772 (Mo. App. 1991), the court of appeals found inconsistent pleas in an abandoned pleading were not admissible

---

[12] The holding of *Jimenez* could be argued to be dicta because other grounds for the Court's decision were also stated. *See* 445 S.W.2d at 317.

[13] Rule 55.12 (1969) was the predecessor to Rule 55.10 with nearly identical language.

relying on this Court's ruling in *Macheca*. In *Macheca*, this Court held a plaintiff's allegations of negligence against two dismissed defendants in the plaintiff's live pleading could not be used by the remaining defendant to impeach the plaintiff at trial because the "[p]laintiff had the right to try his case on the issues made against [the remaining] defendant without regard for the charges [of combined and concurring negligence] previously made against the two involuntarily dismissed defendants." 412 S.W.2d at 465.

There is no justification for excepting abandoned pleadings from the limitation applicable to live pleadings that inconsistent pleadings are not admissible as admissions of a party opponent or inconsistent statements of a party witness.[14] To hold otherwise would defeat the intention of Rule 55.10 to permit liberal pleading of alternative allegations against multiple parties or disjunctive specifications of negligence or fault against a single party in a single action and be contrary to Rule 55.33(a), which allows liberal amendment of pleadings. Applying the limitation to abandoned pleadings is also consistent with holdings that a plaintiff is entitled to sue and recover from all tortfeasors that caused or contributed to cause the plaintiff's injury. *Sanfilippo v. Bolle*, 432 S.W.2d 232, 234-35

---

[14] In this case, Sherrer's allegations and claims against TMC and UPA in her abandoned original petition were restated nearly verbatim in her amended petition. By filing her amended petition, she abandoned her original petition, but she did not abandon her claims against TMC and UPA. Her allegations against TMC and UPA were not inconsistent when they were first pleaded and became inconsistent only when she restated the allegations from her original petition in her amended petition and added claims against BSC and Bard. BSC and Bard should not avoid the limitation against using inconsistent pleadings as an admission or for impeachment because the allegations were initially pleaded in an abandoned pleading or because they were not inconsistent when they were initially pleaded.

21

(Mo. banc 1968); *see Mo. Pac. Ry. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466, 474 (Mo. banc 1978) ("Plaintiff continues free to sue one or more concurrent tortfeasors as he sees fit and nothing that transpires between them as to their relative responsibility can reduce or take away from plaintiff any part of his judgment."). When suing multiple defendants, an "allegation that one is negligent is not an admission that another is not negligent . . . . Such an allegation does not possess the characteristics inherent in admissions against interest." *Sanfilippo*, 432 S.W.2d at 235.

Accordingly, Sherrer had a right to try her case on the issues pleaded against Bard and BSC without regard for the claims previously made against TMC and UPA. Under Rule 55.10, Sherrer was permitted, in a single pleading, to raise alternative, inconsistent claims against TMC, UPA, BSC, and Bard.

BSC and Bard assert a further legal basis for admission of portions of Sherrer's initial petition again citing this Court's holding in *Carter* for the principle that an abandoned pleading may be used to show that a claim added in a subsequent pleading is an afterthought or made in bad faith. *See Carter*, 350 S.W.2d at 791. This rule originated from statements in *Hodges v. Torrey*, a case in which the Court, in its appellate review, referenced a defendant's addition of a defense in subsequent answer as showing the defense was an afterthought. 28 Mo. 99, 103 (Mo. 1859). *Hodges*'s passing reference made in appellate review was then applied to the admission of evidence at trial in *Walser v. Wear*, 42 S.W. 928 (Mo. 1897). In *Walser*, the Court held an abandoned pleading was admissible, even though the abandoned pleading "contained no admission or statement against interest of defendant," to show the defense added in an amended pleading was an afterthought. *Id.*

22

at 933.  BSC and Bard contend, citing *Carter*'s reiteration of the rule in *Walser*, that the abandoned petition's allegations against TMC and UPA were admissible to show Sherrer's claims at trial, raised for the first time in the amended petition, were made in bad faith or were meritless afterthoughts.

Admission of abandoned pleadings for such purpose is contrary to the principles, discussed above, that limit the use of statements in pleading as admissions of a party opponent or impeachment with inconsistent statements.  Evidence that a plaintiff did not initially pursue the claim upon which the case is tried, at the least, is not *per se* admissible. *See Anderson v. McPike*, 86 Mo. 293, 300 (Mo. banc 1885).  Rather, as with evidence generally, it is admissible only if it is logically and legally relevant.  *State v. Tisius*, 92 S.W.3d 751, 760 (Mo. banc 2002).  Such determination is made on a case-by-case basis and requires the circuit court to balance the probative value of the proffered evidence against the risk of misleading or confusing the jury.[15]  *Cox*, 473 S.W.3d at 122.  Although the circuit court overruled Sherrer's relevance objections, the court, thereafter, indirectly commented about the misleading and confusing impact of BSC's and Bard's use of the abandoned petition when it expressed frustration that the case was not being "tried and litigated and determined based upon Sherrer's alleged injuries as they relate or don't relate

---

[15] Sherrer's failure to raise claims of negligence, product defect, and failure to warn against BSC and Bard in her original petition asserting claims of negligence against TMC and UPA may be attributed to many causes that have little to do with the validity of her claims, such as an initial lack of knowledge of the risk of using polypropylene in vaginal mesh slings and the attendant possibility that the product caused her injuries.  Additionally, her attorneys initially may not have raised claims of product design and manufacturing defects because of the resources necessary to pursue such claims against large corporations.

23

to Bard and Boston Scientific" and asked, rhetorically, why the parties could not "just try this thing according to the merits" of the claims against Bard and BSC.

Nevertheless, Sherrer has not proven she is entitled to a reversal of the judgment against her. She asserts the circuit court erred in permitting BSC and Bard to show the caption and allegations of negligence against TMC and UPA in her abandoned petition to the jury in opening statement and other times at trial and to cross-examine her and her witnesses with those allegations of negligence.[16] But, as Sherrer conceded in her motion for a new trial, she did not make a proper or timely objection each time BSC and Bard made a statement or offered evidence of her abandoned petition and allegations against TMC and UPA. Nor did Sherrer seek and obtain a continuing objection to all use of her abandoned petition or allegations against TMC and UPA. By not objecting to each reference, she failed to preserve that particular error and, importantly, the evidence that came in without objection was properly admitted and became cumulative to any evidence that was improperly admitted over her objections. "A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007). As a result, the circuit court did not err in admitting such evidence when it was cumulative, and she cannot prove she suffered prejudice from any erroneous rulings of the circuit court.

---

[16] It is not necessary to address Sherrer's more specific claims that her abandoned petition was improperly used to cross-examine her or her witnesses or BSC's and Bard's additional grounds for admission of allegations in her abandoned petition.

24

### III. Denial of Mistrial Was Not an Abuse of Discretion[17]

In her final allegation of error, Sherrer asserts the circuit court erred in denying a mistrial after Bard displayed to the jury evidence of her settlements with TMC and UPA. Sherrer claims denial of a mistrial was a manifest abuse of the circuit court's discretion because evidence of settlement agreements is generally inadmissible as a matter of public policy in Missouri and can be highly prejudicial. We disagree. The circuit court's denial of Sherrer's request for a mistrial did not constitute a manifest abuse of discretion.

During Bard's cross-examination of Sherrer, Bard displayed a PowerPoint slide that summarized some of Sherrer's activities between 2012 and 2015. The slide consisted of a timeline of events. It was not admitted into evidence, and it was used solely as an aid to the jury. The timeline charted 19 specific events occurring in Sherrer's life from April 2012 to November 30, 2015, with each event on the timeline described in a "text box." The text boxes above the timeline described "medical / life events," and the text boxes below the timeline described "legal events." *See* attached Appendix A.

Referring to the text box on the top left side of the timeline, Bard's counsel asked Sherrer questions about her time in China between June 2012 and April 2014. After a few brief questions, the circuit court directed Bard to "[t]ake that down for a second, please," referring to the PowerPoint slide. Bard's counsel immediately responded, "oh yes" and complied with the court's request. When counsel approached the bench, Bard's counsel

---

[17] This section of the opinion borrows without further reference portions of the thorough court of appeals opinion by the Honorable Cynthia L. Martin, issued before this Court granted transfer.

25

stated, "I know, it wasn't supposed to be up there. I'd asked him to take it off." Bard's counsel was referring to the fact that the PowerPoint slide included a text box on the bottom right side that identified an event dated "Nov. 15, 2014" describing a "Settlement with Truman Medical Center and University Physicians Associates." Bard's counsel explained the PowerPoint slide was an old version that had not been redacted by Bard's technology team to remove the reference to the settlements in compliance with the court's earlier orders.

Sherrer moved for a mistrial, arguing the reference to the settlements in the PowerPoint slide was inadmissible; inclusion of the reference to settlements on the slide violated the circuit court's rulings excluding any reference to prior settlements; and the prejudicial impact of the reference to the settlements magnified the fact that the circuit court permitted the defendants to discuss throughout the trial that Sherrer first filed suit against TMC and UPA. After considering the arguments of counsel, the circuit court ruled:

> I'm not going to say it's not troublesome to me, because it was up there, but I will note for the record that the copy -- first of all the copy of the timeline that I have in front of me does not contain any reference to the settlement. It was put up there -- it was flashed up there during the course of a colloquy between [Bard's counsel] and . . . Sherrer. So I think and I hope that the jury's attention was focused on that colloquy between the two.

> I noticed it only because I turned up there, and I immediately told them to take it off, they did. There's little doubt in my mind that it was completely inadvertent because it does not match what I have in my hands, what you have in your hands, what [Bard's counsel] -- [Sherrer's counsel] . . . [have] in your hands, and what we've been bandying about in the last afternoon. So I'm confident that it was inadvertent. It was taken down immediately. It was up there for a short period of time.

> Again, we're in the fifth week of a trial, that incidentally was supposed to go two and a half weeks, and granting a mistrial, again, as I said before, is a

drastic measure, a drastic remedy. I cannot tell you how reluctant I am to do that, so I'm not. My concerns -- your concerns are shared by me. And I mean -- but I think that it was remedied in a relatively short span, a short time.

So, yeah, I'm going to make a record. We'll get a copy of the exhibit [referring to the PowerPoint slide]. We'll mark that as a Court Exhibit, . . . and we'll add it to the Court's file. Any further relief that you're requesting I'll consider. But the grant of a mistrial will be denied.

Sherrer did not ask the circuit court for any further relief beyond her request for a mistrial.

Although it is well-established that evidence of settlement negotiations is generally inadmissible, *see, e.g., Newman v. Ford Motor Co.*, 975 S.W.2d 147, 149 (Mo. banc 1998), the decision whether to grant a mistrial rests within the circuit court's sound discretion because the trial judge is "in the best position to determine whether the incident had a prejudicial effect on the jury." *State v. Ward*, 242 S.W.3d 698, 704 (Mo. banc 2008).

"A mistrial is a drastic remedy, and the decision to grant one is largely within the discretion of the trial court." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 867 (Mo. banc 1993). This Court will reverse a circuit court's order denying a mistrial "only where there has been a **manifest abuse of discretion**." *Id*. (emphasis added). To establish a manifest abuse of discretion, a movant must demonstrate "a grievous error where prejudice cannot otherwise be removed" by any lesser sanction. *Id*.; *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 208 (Mo. banc 1991). The movant for mistrial bears the burden to show both prejudice and that mistrial is the only sufficient remedy. *Cf. Callahan*, 863 S.W.2d at 867. Because Sherrer has not demonstrated she was actually prejudiced by the brief display of a demonstrative aid that contained a reference to her prior settlements,

she has not carried her burden to establish the circuit court manifestly abused its discretion by overruling her motion for mistrial.

The disputed slide was neither offered nor admitted into evidence for the purpose of showing the slide to the jury, and the circuit court assessed whether the jury saw the reference to the settlements with TMC and UPA during the brief time it was displayed. The trial judge, who was in the best position to observe the jury and track the focus of the jurors' attention, specifically found it was unlikely the jury saw the improper reference to the settlements with TMC and UPA. On appeal, Sherrer contends there is reason to believe some jurors observed the slide and text box, but the circuit court assessed the situation in real-time and found it unlikely. Sherrer does not contest the circuit court made this assessment.

Moreover, the record supports the circuit court's finding. First, the slide was displayed for a short period of time before the circuit court innocuously instructed Bard's counsel to take the slide down. In doing so, the court gave no indication of the slide's impropriety nor a reason for ordering Bard to take the slide down. The slide was displayed during a point in Sherrer's testimony in which she was describing her activities in China during a period of time on the timeline well before the settlements took place. The reference to Sherrer's time in China was depicted on the top left side of the PowerPoint slide while the reference to the settlements were on the bottom right side. At no time while the slide was displayed did Sherrer's testimony reference the settlements, nor did Bard's line of questioning implicate the settlements in any way. After displaying the slide, the following exchange took place:

28

Q. [From] 2012 to 2014, you were in China, right?
A. Yes.
Q. And you were working as an English teacher you said for six hours a week, right?
A. About that, yes.
Q. And getting paid for that, right?
A. Yes.
Q. We talked earlier, said that you'd been in China in those earlier years. You showed us that with those pictures?
A. One year. Yes.
Q. One year. It's `07 to `08?
THE COURT: Take that down for a second, please.

This record clearly indicates neither counsel's questions nor Sherrer's testimony referred or otherwise directed the jury's attention to the slide. What is more, this brief exchange was the only exchange that occurred while the slide was displayed. It covered just 15 lines of trial transcript and took place during the fifth week of a product liability trial for which the entire transcript exceeded 8,000 pages. This record supports the circuit court's finding that it was unlikely the jurors noticed the PowerPoint slide as they were more likely focused on Sherrer's testimony and that ordering a mistrial at this point would be a grossly disproportionate sanction.

Second, the slide in question was highly detailed, containing 19 different text boxes, most of which contained multiple lines of text. Even assuming the jury saw the slide, the timeline's complexity supports the circuit court's conclusion that it was unlikely the jury noticed the singular reference to Sherrer's settlements with TMC and UPA during the brief period the slide was displayed. Indeed, Sherrer's own counsel—three of whom were present at trial—failed to notice the settlement's references on the demonstrative aid while the slide was displayed.

Sherrer bears the burden of establishing she was prejudiced by the Power Point slide to the point where mistrial is the only sufficient remedy. *Cf. Callahan*, 863 S.W.2d at 867. Although she contends there is reason to believe the jury observed the slide and text box, Sherrer cannot established she actually suffered prejudice from the slide's display, let alone prejudice warranting a mistrial. The separate opinion and Sherrer assert denying her request for mistrial nevertheless was a manifest abuse of discretion. The separate opinion alleges the PowerPoint slide in conjunction with BSC and Bard's use of the abandoned original petition "invited the jurors to conclude Ms. Sherrer's claims against BSC and Bard were meritless afterthoughts." *Slip op.* at 10. Sherrer claims the slide magnified the prejudice of allowing BSC and Bard to use portions of her abandoned original petition containing claims against TMC and UPA. The separate opinion further contends "The evidence of her settlement with TMC and UPA strengthened the conclusion that the dismissed defendants were responsible for her injuries." *Id*. But these arguments rest on the presumption that the jury saw the slide and, specifically, the text box referencing the settlements. This presumption contradicts the circuit court's finding and the record before this Court. Ultimately, the record reflects the circuit court carefully deliberated whether to grant a mistrial of a multi-week trial over a brief and inadvertent display of a single reference to Sherrer's prior settlements. The circuit court assessed the totality of the circumstances and reasonably concluded a mistrial was not the proper remedy because it did not think the jury saw the slide, let alone the text box referencing the settlements; therefore, it was unlikely there was any potential for prejudice in the first place. This Court will defer to that finding.

30

Even if Sherrer could establish the jury saw the disputed slide and text box, Sherrer has not established the error was so grievous to warrant a mistrial. First, it was Sherrer's burden to demonstrate that prejudice could not be removed except by mistrial, *cf. Callahan*, 863 S.W.2d at 867, but Sherrer has not met this burden. The circuit court expressly invited Sherrer to request further curative relief after it denied her request for a mistrial. Sherrer sought no other relief at that time.[18] Second, this Court could not find a single Missouri case in which a circuit court's denial of a motion for mistrial in a civil action was found to be a manifest abuse of discretion when evidence was admitted in direct conflict with a court's *in limine* ruling.

In *Payne v. Fiesta Corp.*, 543 S.W.3d 109, 123 (Mo. App. 2018), plaintiff's counsel improperly injected the issue of insurance into the case. The court of appeals recognized the established principle that reference to a defendant's insurance coverage is improper, but the court also noted that improper reference to insurance coverage does not categorically warrant reversal. *Id*. at 124. Noting the circuit court was in the best position to determine the prejudicial effect of the improper injection of the issue of insurance coverage, the court of appeals found the circuit court's denial of a request for mistrial did not constitute a manifest abuse of discretion. *Id*. at 125.

---

[18]  For example, Sherrer could have requested the circuit court instruct the jurors to disregard anything they may have observed in the slide without mentioning the settlement text box. Such a curative step would have cured any potential for prejudice and would not have drawn more attention to the inadmissible evidence as there was a number of different topics and text boxes in the slide.

In *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 25 (Mo. App. 2013), the circuit court ruled *in limine* to exclude evidence of prior instances similar to the accident at issue in the case. The plaintiff, however, elicited testimony that violated the *in limine* order. *Id*. The defendant moved for a mistrial, but the circuit court overruled the defendant's motion. *Id*. Finding no manifest abuse of discretion, the court of appeals affirmed. *Id*. at 26. Likewise, *Wheeler ex rel. Wheeler v. Phenix*, 335 S.W.3d 504, 514 (Mo. App. 2011), involved a party improperly injecting the issue of insurance coverage into a personal injury matter. In *Wheeler*, the court of appeals affirmed the circuit court's overruling of a motion for mistrial, holding although "it is improper to inject the issue of . . . liability insurance into an action for damages," the circuit court did not manifestly abuse its discretion because the appellant failed to demonstrate the single, brief reference to insurance coverage "was injected in bad faith or that [the appellant] suffered prejudice requiring a mistrial." *Id*. at 514-15.[19]

This Court has found a manifest abuse of discretion in overruling a motion for mistrial in *City of Springfield v. Thompson Sales Co.*, 71 S.W.3d 597 (Mo. banc 2002). But *City of Springfield* is distinguishable from the instant case. In *City of Springfield*, the

---

[19] The court of appeals reached similar results in *Brown v. Bailey*, 210 S.W.3d 397, 411-12 (Mo. App. 2006) (finding no manifest abuse of discretion in denying mistrial even though evidence of doctor's prior litigation history was elicited "in direct conflict with the trial court's ruling on [a] motion in limine"); *Cole ex rel. Cole v. Warren County R-III School District*, 23 S.W.3d 756, 759 (Mo. App. 2000) (finding no manifest abuse of discretion even though evidence of plaintiff's financial condition was elicited in direct conflict with order *in limine*); and *Hale v. American Family Mutual Insurance Co.*, 927 S.W.2d 522, 528-29 (Mo. App. 1996) (finding no manifest abuse of discretion even though a demand letter marked "Don't send to jury" was inadvertently sent to the jury during deliberations).

32

City argued during voir dire that assessing damages against the City would burden taxpayers. *Id*. at 599. This Court noted the settled prohibition against referring "in argument to the burden a verdict might impose on taxpayers," *id*. at 600, and found, although similar error in other cases was sufficiently remediated by a contemporaneous rebuke of counsel and a directive that the jury disregard the comment about taxes, that remedy was insufficient because the city's suggestion that taxes would increase was more inflammatory than a general reference to the burden of a verdict on taxpayers and the circuit court did not contemporaneously admonish the jury to disregard the remark. *Id.* at 601. By contrast, the circuit court in the instant case found it was unlikely the jury noticed the reference to the settlements in the first place. Therefore, the circuit court found there was likely no prejudice to be cured.[20]

Even if the jury did see the reference to the settlements, the circuit court did not manifestly abuse its discretion by overruling Sherrer's request for mistrial. As the holdings in *Payne*, *Delacroix*, *Wheeler*, and many other decisions set forth, the admission of clearly improper evidence does not end the analysis and categorically warrant mistrial. *See, e.g., Payne*, 543 S.W.3d at 125; *Delacroix*, 407 S.W.3d at 26; *Wheeler*, 335 S.W.3d at 515. Rather, Sherrer must demonstrate "a grievous error where prejudice cannot otherwise be removed" by any lesser sanction. *Callahan*, 863 S.W.2d at 867. These cases emphasize the deference appellate courts must afford to circuit courts' assessment of the prejudicial

---

[20] Under these circumstances, the circuit court instructing the jury to disregard the settlements reference would have *injected*, not resolved, the very prejudice of which Sherrer now complains.

effect of trial errors and to circuit courts' judgment as to the best way to remedy any alleged prejudice. Moreover, the court of appeals in *Payne*, *Delacroix*, *Wheeler*, and other cases found no manifest abuse of discretion even though it was uncontested that the jury actually heard inadmissible evidence. Here, however, the circuit court found the jury likely did not notice the improper reference to the settlements, and Sherrer does not challenge the circuit court made this finding.[21] Sherrer, instead, seeks an opinion from this Court holding a circuit court manifestly abuses its discretion by not imposing the most drastic remedy available during a trial merely because there was a *chance* the jury saw an improper demonstrative aid. But such a holding does not reflect the law in this state. Sherrer, rather, must demonstrate both prejudice and that mistrial is the only sufficient remedy. She has failed to show either.

The record indicates the circuit court considered the totality of the circumstances surrounding the slide in question and, after careful deliberation, found its brief display did

---

[21] The separate opinion contends, "BSC and Bard's repeated references to Ms. Sherrer's allegations against TMC and UPA throughout trial in support of their defense that her claims against BSC and Bard were afterthoughts and made in bad faith exacerbated the prejudice caused by showing evidence of settlement to the jury." *Slip op.* at 10. But the separate opinion concurs in this opinion's conclusion that the references to Sherrer's abandoned allegations against TMC and UPA were not prejudicial because that evidence was merely cumulative to other evidence admitted without objection. Sherrer and the separate opinion rely on the argument that the brief display of the reference to the settlements, combined with the defendants' repeated references to TMC and UPA, constituted a grievous error resulting in a manifest abuse of discretion. But because the defendants' references to TMC and UPA were not prejudicial error in the first place, the brief reference to her prior settlements with those entities cannot rise to the level of grievous error that constitutes a manifest abuse of discretion.

34

not warrant mistrial of a multi-week trial. The circuit court did not abuse its discretion in finding the slide had no improper effect on the jury.

## Conclusion

The circuit court's judgment in favor of Boston Scientific Corporation and C.R. Bard Inc. is affirmed.


Wilson, Russell, Powell and Fischer, JJ., concur;
Breckenridge, J., concurs in part and dissents in part in separate opinion filed;
Draper, C.J., and Stith, J., concur in opinion of Breckenridge, J.

Appendix A





# SUPREME COURT OF MISSOURI
## en banc

EVE SHERRER,                                    )
                                               )
           Appellant,              )
                                               )
v.                                             )    No.  SC97465
                                               )
BOSTON SCIENTIFIC CORPORATION                  )
and C.R. BARD, INC.,                           )
                                               )
           Respondents.            )

## OPINION CONCURRING IN PART AND DISSENTING IN PART

While I concur with the holdings of the per curiam opinion regarding Eve Sherrer's first two claims of error, I respectfully dissent from its holding that the circuit court did not err in denying a mistrial when Bard showed the jury information regarding Ms. Sherrer's settlement with Truman Medical Center (TMC) and University Physician Associations (UPA).  In concluding the circuit court did not err in denying a mistrial, the per curiam opinion fails to consider the totality of the circumstances in this case.  Throughout the case from beginning to end, Bard and BSC utilized Ms. Sherrer's allegations against dismissed defendants to establish the invalidity of her claims at trial.  This heightened the prejudice resulting from the display of settlement information and warrants a mistrial.

During Bard's cross-examination of Ms. Sherrer, it displayed to the jury PowerPoint slides on a 20-by-20-foot screen and multiple monitors. Two of the slides depicted a timeline of Ms. Sherrer's medical/life and legal events between 2010 and 2015, with each event on the timeline contained in a "text box." The text boxes on the top half of the timeline described medical/life events, while the text boxes on the bottom half described legal events relating to this case.

While cross-examining Ms. Sherrer, Bard's counsel asked her assistant to put up on the screen the first slide of "the 543 chronology"[1] and then advised Ms. Sherrer, "This is what we were looking at earlier. This is the first slide." Bard's counsel then asked her five questions relating to information on the first slide before stating, "So on the legal events, and we talked about records and the original petition being filed in 2012. So now we're about to move into a next segment there, okay?" Counsel started to reference 2012, when she stopped and said to her assistant, "We can jump to the next page, . . . please, where we talk about this."

The assistant put the second slide of the chronology on the 20-by-20-foot screen for the jury. On that slide, sitting just one text box away from a text box regarding the petition to which Bard's counsel had just referred, sat the largest text box on the timeline of "legal" events. It read, "Settlement with Truman Medical Center and University Physicians Associates," dated November 15, 2014. The second slide of the chronology is reproduced below.

---

[1] The PowerPoint slides were marked as demonstrative exhibit 543.

2



With the slide on screen, Bard's counsel continued her questioning of Ms. Sherrer:

> Q. (By [Bard's Counsel]) 2012 to 2014, you were in China, right?
>
> A. Yes.
>
> Q. And you were working as an English teacher you said for six hours a week, right?
>
> A. About that, yes.
>
> Q. And getting paid for that, right?
>
> A. Yes.
>
> Q. We talked earlier, said that you'd been in China in those earlier years. You showed us that with those pictures?

A. One year. Yes.

Q. One year. It's '07 to '08?

THE COURT: Take that down for a second, please.

Bard's counsel did as requested and, when counsel approached the bench, stated, "I know, it wasn't supposed to be up there. I'd asked him to take it off." Ms. Sherrer's counsel advised the circuit court that he intended to request a mistrial and that he would make a better record later so the proceedings with the witness on the stand could resume.

At the next available opportunity, Ms. Sherrer's counsel moved for a mistrial, arguing the slide's reference to Ms. Sherrer's settlement with TMC and UPA was highly prejudicial and the prejudicial effect of the reference was magnified by BSC's and Bard's incessant references to her allegations against TMC and UPA throughout the proceedings. Bard contended the reference to Ms. Sherrer's settlement with TMC and UPA was not grounds for a mistrial.

After considering the arguments of counsel, the circuit court ruled:

I'm not going to say it's not troublesome to me, because it was up there, but I will note for the record that the copy – first of all the copy of the timeline that I have in front of me does not contain any reference to the settlement. It was put up there – it was flashed up there during the course of a colloquy between [Bard's counsel] and . . . [Ms.] Sherrer. So I think and I hope that the jury's attention was focused on that colloquy between the two.

I noticed it only because I turned up there, and I immediately told them to take it off, they did. There's little doubt in my mind that it was completely inadvertent because it does not match what I have in my hands, what you have in your hands, what [Bard's counsel] – [Ms. Sherrer's counsel] . . . [have] in your hands, and what we've been bandying about in the last afternoon. So I'm confident that it was inadvertent. It was taken down immediately. It was up there for a short period of time.

4

> Again, we're in the fifth week of a trial, that incidentally was supposed to go two and a half weeks, and granting a mistrial, again, as I said before, is a drastic measure, a drastic remedy. I cannot tell you how reluctant I am to do that, so I'm not. My concerns – your concerns are shared by me. And I mean – but I think that it was remedied in a relatively short span, a short time.
>
> So, yeah, I'm going to make a record. We'll get a copy of the exhibit. We'll mark that as a Court Exhibit, . . . and we'll add it to the Court's file. Any further relief that you're requesting I'll consider. But the grant of a mistrial will be denied.

Ms. Sherrer did not ask the circuit court for any further relief.

Although the circuit court characterized the display of the slide to the jury as the slide being "flashed" up on the screen, the record shows the slide was displayed on the 20-by-20-foot screen and other monitors while multiple questions were asked and answered. Bard's counsel called attention to the two chronological slides in her statements and questions to Ms. Sherrer and her directions to her assistant. First, she expressly directed her assistant to put up the first chronological slide on the screen, referred Ms. Sherrer to that slide and then focused on the information on the slide in the questions she asked Ms. Sherrer. Bard's counsel then announced she was "about to move into the next segment there." She started to ask Ms. Sherrer about 2012 but paused in the middle of a question, told her assistant, "We can jump to the next page" (the second chronological slide with settlement information), "where we talk about this." She then resumed her question about Ms. Sherrer's activities during 2012 to 2014 when she was in China, as shown on that slide. This colloquy between Bard's counsel and Ms. Sherrer clearly directed the jury's attention to the very slide the circuit court hoped had gone unnoticed.

5

BSC and Bard, as well as the per curiam opinion, characterize the circuit court's statement – "I think and hope that the jury's attention was focused on that colloquy between the two" – as a finding of the court, based on its observation, that the jury was not viewing the screen but was, instead, looking at Bard's counsel and Ms. Sherrer. While deference is given to a circuit court's factual findings regarding the prejudicial effect of improper evidence because the trial court is in the best position to observe the impact of the evidence on the jury, *Vaeth v. Gegg*, 486 S.W.2d 625, 631 (Mo. 1972), the record, here, refutes that the circuit court made a factual finding that members of the jury were looking at Bard's counsel and Ms. Sherrer rather than the slide.

If the circuit court had been observing the jurors, it would have known where the jurors' attention was focused and would not have *hoped* the jurors were focused on the colloquy rather than the settlement information on the slide. The other statements of the circuit court further indicate it was not observing the jurors or the screen while the slide was displayed. Rather, the circuit court noted the paper copy of the slide, which the court had in front of it, did not include the text box with information of Ms. Sherrer's settlement and said it noticed the information on the slide only when it turned to look at the slide. Unlike the circuit court, the jury was not preoccupied with a paper copy of the exhibit.

Moreover, the record indicates the circuit court's ruling was based on its reluctance to retry a trial that had drawn on for weeks. In its explanation for denial of Ms. Sherrer's motion for a mistrial, the circuit court said, "[W]e're in the fifth week of a trial, that incidentally was supposed to go two and a half weeks, and granting a mistrial, again, as I said before, is a drastic measure, a drastic remedy. I cannot tell you how reluctant I am to

6

do that, so I'm not." The per curiam opinion gives no weight to this statement and instead characterizes the circuit court's other observations as a ruling that the jury did not see the reference to settlement. The circuit court, however, did not affirmatively state the jury failed to notice the text box. The circuit court was not communicating its reasonable conclusion compelled by a careful deliberation of the totality of the circumstances; it was expressing its unwillingness to undergo the burden of a trial that had already drawn on for five weeks.

Bard's purpose in projecting the slide on the 20-by-20-foot screen was for the information on the slide to be seen by the jury. While the per curiam opinion argues the slide was "highly detailed, containing 19 different text boxes, most of which contained multiple lines of text", when displayed on the 20-by-20 foot screen, the text box with the settlement information would have been large and readily apparent to the viewer. Its conspicuity is confirmed by the fact both the circuit court and Bard's counsel saw it immediately upon turning their attention from paper copies to the slide. This record demonstrates the jury observed the information on the slide, including the settlement information.

The question then becomes what prejudicial effect can be ascribed to Bard's display of settlement information. Evidence of settlement agreements tends to be highly prejudicial. *Newman v. Ford Motor Co.*, 975 S.W.2d 147, 149 (Mo. banc 1998); *Daniel v. Ind. Mills & Mfg., Inc.*, 103 S.W.3d 302, 316 (Mo. App. 2003). Because it is highly prejudicial, evidence of settlement agreements is, generally, not admissible and should be kept from the jury. *Holdeman v. Stratman*, 556 S.W.3d 46, 50 (Mo. App. 2018).

7

Particularly, a plaintiff's settlement with one of multiple defendants may not be used to establish the invalidity of a plaintiff's claim against a remaining defendant. *See Joice v. Mo.-Kan.-Tex. R.R. Co.*, 189 S.W.2d 568, 575 (Mo. 1945). "Allowing evidence of settlement and negotiation to come before the jury creates a possibility of bias that has no place in our system of justice." *Hancock v. Shook*, 100 S.W.3d 786, 799 (Mo. banc 2003). Admission of evidence of settlement, whether an offer of settlement or a settlement agreement, has been found to be reversible error. *O'Neal v. Pipes Enters., Inc.*, 930 S.W.2d 416, 424 (Mo. App. 1995); *Rodgers v. Czamanske*, 862 S.W.2d 453, 460 (Mo. App. 1993).

Declaring a mistrial is a drastic remedy, and, as recognized by the per curiam opinion, mistrials need not be categorically granted in every case in which evidence of settlement is improperly presented to the jury. The prejudicial effect of the reference to settlement in this case, however, was compounded by other improper comments, similar to the circumstances presented in *City of Springfield v. Thompson Sales Co.*, 71 S.W.3d 597 (Mo. banc 2002). In *City of Springfield*, the Court assessed whether an improper statement in voir dire – a reference to the burden a verdict might impose on taxpayers – introduced sufficient prejudice to warrant a mistrial. *Id.* at 598. In analyzing the improper reference's prejudicial effect, the Court noted the prejudice was compounded by earlier comments and took note of the fact the improper reference came right after counsel made other improper comments. *Id.* at 601. The Court held the improper comments, "when considered together and in juxtaposition to each other," required a mistrial although any single comment "might not be sufficiently prejudicial in isolation." *Id.* Considering the facts and circumstances of this case, in which Bard and BSC utilized Ms. Sherrer's allegations against dismissed

8

defendants to establish the invalidity of her claims at trial, the prejudice was unusually heightened and, when considered in juxtaposition with Bard's and BSC's use of the original petition, warrants a mistrial.[2]

The per curiam opinion would have the Court consider, in isolation, the display of what it characterizes as a busy slide and a colloquy that occupies less than a page within 8,000 pages of trial transcript. Those 8,000 pages, however, are replete with references to the dismissed defendants, so much so that the circuit court complained the case was not being tried on Ms. Sherrer's claims against Bard and BSC but on her claims against TMC and UPA.

In opening statements, the defendants informed the jury that Ms. Sherrer had first sued only TMC and UPA and, before they finished cross-examining the first witness, they informed the jury of the specific allegations of negligence asserted against TMC and UPA. Those same allegations were then continually referenced in the cross-examinations of Ms. Sherrer and multiple witnesses. During the cross-examination of Ms. Sherrer, alone, Bard's counsel referenced Ms. Sherrer's initial petition and her claims against TMC and UPA no fewer than nine times. In fact, Bard's counsel referenced Ms. Sherrer's initial

---

[2] The per curiam opinion comments that a circuit court's overruling of a motion for new trial is given such deference there are very few cases in which an appellate court has reversed. By so commenting, it seemingly suggests that a circuit court's overruling of a motion for new trial is irrebuttably not an abuse of discretion. No Missouri court has held a circuit court has absolute, virtually unreviewable, discretion in overruling a motion for new trial; nor should that be the law. While the circuit court's exercise of its discretion is given great deference, this case is the rare case in which the totality of the circumstances show the circuit court abused its discretion because the prejudice suffered by Ms. Sherrer cannot be corrected by relief other than a mistrial.

petition in her last question to Ms. Sherrer before her assistant switched to the slide showing Ms. Sherrer's settlement with TMC and UPA.

The defense's strategy invited the jurors to conclude Ms. Sherrer's claims against BSC and Bard were meritless afterthoughts because she first sued only TMC and UPA for causing the same injuries she claimed at trial were caused by BSC and Bard. The evidence of her settlement with TMC and UPA strengthened the conclusion that the dismissed defendants were responsible for her injuries. BSC's and Bard's repeated references to Ms. Sherrer's allegations against TMC and UPA throughout trial in support of their defense that her claims against BSC and Bard were afterthoughts and made in bad faith exacerbated the prejudice caused by showing evidence of settlement to the jury.

Under these circumstances, the display of information relating to Ms. Sherrer's settlement with dismissed defendants was a grievous error, and the resulting prejudice could not be removed by any relief other than a mistrial. I would find the circuit court's overruling of Ms. Sherrer's motion for a mistrial was a manifest abuse of discretion, and the severe prejudice requires reversal.

_____
PATRICIA BRECKENRIDGE, JUDGE

10